[Argued November 14, 1892; decided November 28, 1892.]

## MARY A. BECKLEY v. J. S. BECKLEY.

[S. C. 31 Pac. Rep. 470.]

DIVORCE— CRUELTY *— CODE, § 495.— Legal cruelty authorizing a divorce is
a term not easily defined. It is not every threat nor overt act of violence ;
there must be an intention to worry the other. Cruelty is a question of
intent,— a mental purpose to wound the feelings of the other party.

HUSBAND AND WIFE— DIVORCE.—A divorce will not be granted upon the
ground of cruel and inhuman treatment where it appears that both
parties were active in contributing to the injury complained of.

Douglas County: MARTIN L. PIPES, Judge.

Plaintiff appeals.    Affirmed.

*Wm. R. Willis*, for Appellant.

*Jas. W. Hamilton*, for Respondent.

MOORE, J.—This is a suit for divorce brought by the
wife against the husband on the ground of cruel and
inhuman treatment.    A counter-claim was filed by the
husband asking a decree on the same grounds, but the
court below denied the claim of each, and the plaintiff
appeals.

It appears from the pleadings and evidence that the
parties were married in Douglas County, Oregon, May

---

*NOTE.—An interesting and exhaustive review of the authorities on this
subject will be found in Central Law Journal, vol. 37, p. 66, in an article
entitled, " What is Legal Cruelty ?"—REPORTER.

21, 1873, and that they have five children, the youngest
being four and the oldest sixteen years; that about two
years ago their eldest daughter, then about sixteen, died;
that up to that time they had lived together happily;
that upon the death of this daughter the plaintiff become
restless in consequence of the loss, and gave less of her
time to her home duties; that in May, 1890, she attended
a picnic in company with several others, and in going
there a lady friend rode with her in the buggy, and as
they were about to ascend a hill the lady riding with
plaintiff expressed fears about her ability to manage the
horse, and suggested that a Dr. Ben Bradley, then riding
in another carriage, be invited to take her place and
drive the horse.   He did so, and drove to the summit
with the plaintiff.   The defendant, hearing of this, disap-
proved the act, and requested that his wife should not
again meet or talk with Dr. Bradley; that she paid but
little attention to her husband's request, and from that
time an estrangement began to spring up between them;
that she often went to the hotel where the doctor was
boarding, and also met him at the drug store; that no
serious difficulty occurred till about December 10, 1890,
when she went to the drug store and remained there
about three quarters of an hour in his company; that
this drug store was a public place, and others were com-
ing and going all the time she was there; that the
respondent had a store about one hundred yards from the
drug store, and he saw his wife go there; that after she
had remained there for that time he went to the drug
store, and when Dr. Bradley saw him he left by a back
way.   She walked from the drug store with her husband
to his store, and as he reached it she claims that he
threatened to shoot her.   He claims that he said that he
would shoot both her and Dr. Bradley if he caught them
together again, unless he could keep them apart in some
other way.

The next act complained of occurred about April 10,
1891.   The plaintiff had gone out, and in her absence the

defendant locked the door, but as soon as she returned he unlocked it and let her in.    May 5, 1891, was the date of the next act in the drama, and consisted in the defendant again locking her out.    He had returned from the store, had put the small children to bed, and had gone to bed himself.    After he had been in bed about an hour he got up and went to the porch where she was sitting and asked her to come to bed.    She told him she would when she got ready.    He then went in and locked her out, and she crawled through the window.    About May 15, 1891, the plaintiff and defendant had the next difficulty.    She had been to a prayer meeting, and he accused her of again talking to Dr. Bradley.    Their oldest daughter, then lying in an adjoining room, told her mother to come into her room and sleep with her, and not listen to the growling of her father.    He says that he spoke to the daughter, and told her not to speak in that manner, and she repeated the language, whereupon he took his slipper and punished the child.    The plaintiff went into the room where they were and told him to stop whipping her.    He then took hold of his wife and told her to stay out and mind her business, as he claims.    She says that he pushed her against the side of the door, and said to her:    "Damn you, get in there, or I will kick you down stairs."

The last act occurred on January 25, 1892.    The defendant claims that he was desirous of leaving Oakland, where he was then living, and of going to Roseburg, where he could be away from the surroundings and company that seemed to disturb his happiness; that he requested his wife to go with him to Roseburg, but she refused.    He tried to get the oldest daughter to induce her mother to go, and even had the youngest child plead with her, but without success.    On that day, as he was packing up to move, he took down a picture hanging on the wall, when his wife claimed it, and he gave it to her. In taking down the second picture, which she also claimed, a scuffle ensued, and he pushed her against the sewing-machine and hurt her.    He then attempted to

take down the third picture, and she pushed him off the lounge on which he was standing. He then moved to Roseburg, and she and the oldest daughter remained at Oakland. This constitutes the charge of the plaintiff in her complaint. There are several minor things that serve to give light and shade to the general picture of their home life. It appears that the defendant was a careful provider for his house, and that he took nearly the entire care of the smaller children; that he furnished the plaintiff help in the house; that he had a horse and buggy for her use, and that she came and went as she pleased; that in driving she did not take any pains to have any of her children with her; that defendant did not for a moment think there was anything improper in his wife's relations with Dr. Bradley, except that she seemed to spend too much of her time in his company; that the defendant was a man of quick temper, and when in anger he frequently said and did things he was sorry for thereafter, and that he went to his wife after they had difficulties and begged her to forgive him; that after the trouble began he made presents to his wife, and tried to win her affections, but that she said she did not care for him. Appellant claims that these facts constitute cruelty on the part of the defendant, and entitle her to a decree of divorce.

Legal cruelty, authorizing a dissolution of the marriage contract, is a term not easily defined. Mr. Bishop, in his Law of Mar. & Div. (4 ed. § 717), gives the following: "Cruelty, therefore, is such conduct in one of the marital parties as endangers, either apparently or in fact, the physical safety or health of the other, to a degree rendering it physically or mentally impossible for the endangered party to discharge properly the duties imposed by the marriage." It is not every threat uttered while smarting under real or imaginary slights, or prompted by the pangs of jealous rage, nor overt acts of violence, even committed in the heat of passion caused by the aggravation of the other party, that constitutes

cruelty.    There must be an intention to worry the other, and this may be successfully accomplished without a single threat and in the absence of any act of violence. The studied sneer, the wilful neglect, or the careless disregard of the other's wishes, may, and often does, endanger the health of the injured party.    Cruelty is a question of intent — a mental purpose to wound the feelings of the other party.    Such acts generally make a deeper impression than all others; they are beyond the aid of medical skill.    No balm but the restoration of that feeling of love, that perfect trust, that utter confidence, which should characterize the married relation, can restore to the troubled mind that complete rest which such relation should ever furnish.

Applying these rules to the case at bar, has the plaintiff presented such a state of facts as to constitute cruel and inhuman treatment?    It is true the defendant threatened to shoot his wife; he admits it; but it was upon condition that he would do so if he could not keep her apart from the man who was causing the trouble.    This threat is made six months after he suspects his wife is too attentive to Dr. Bradley.    He had requested and urged her to desist; and when he found that his wife neglected her family,—that she sought the company of this man, and that his coaxing and entreaty were in in vain,—exasperated almost beyond human endurance, finding her in his company, he makes use of language which constitutes the foundation of this suit.    This threat is coupled with a condition.    The plaintiff could avoid all danger of its execution by adopting a different course, even if she had supposed that he intended to shoot her.    His threats, however, could not be justified by any acts of hers, even if she had been guilty of the gravest crime;    and the circumstances are stated only to show the motives that prompted them, and not in justification thereof.    The first time he locked the door, he rose and unlocked it as soon as she came and knocked, and his conduct does not show any disposition to worry or annoy

her.  The second time he locked the door, and thereby compelled her to climb through a window to get into the house, because she refused to go to bed.  This act was certainly unwarranted, and was not such treatment as she was entitled to from him.  The trouble they had at the time he was punishing the daughter but serves to show that they were both human.  It was natural for the mother to see that he did not punish the child too severely ; and it was equally natural for him to feel that she should not interfere, particularly when he was correcting the child for upholding the mother.  The language and act were wrong, and illustrate the fact that the defendant had a quick temper.  The last act about the pictures shows that each was equally in the wrong.  He felt vexed that she would not go with him to Roseburg, and she felt vexed that he should attempt to take down pictures that belonged to her.  In the scuffle which followed over the possession of the picture, she was hurt on the sewing-machine, but this did not prevent her from immediately pushing him from the lounge when he attempted to take down the third picture.

To entitle one to a decree of divorce for cruel and inhuman treatment, the injured party must come into a court of equity free from the suspicion that he has contributed to the injury of which he complains.  Divorces should not be granted by weighing the evidence and decreeing in favor of the one least guilty, where both have taken an active part in the mutual discord.  Equity relieves the injured party, but not the vanquished.  In the struggles for supremacy, or to vent spleen, spite, or hatred, the willing actors may fight out the battles of wedded life, but they cannot invoke the aid of equity after their own efforts have failed.  Believing, as we do, after carefully examining all the evidence, that each party took an active part in this unfortunate affair, we can see no error committed by the court below in denying a decree to either, and the decree must be affirmed.