Argued June 12, affirmed July 11, 1916.

# REAM *v.* REAM.

(158 Pac. 670.)

**Divorce—Evidence—Sufficiency.**

1. In a suit for divorce, evidence *held* to warrant a decree for plaintiff on the ground of cruel and inhuman treatment.

   [As to cruelty as ground for divorce, see notes in 29 Am. Dec. 674; 73 Am. Dec. 619; 40 Am. Rep. 463; 51 Am. Rep. 736; 65 Am. St. Rep. 69.]

From Klamath: HENRY L. BENSON, Judge.

In Banc. Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by Clara Ream against Edward Ream for a divorce, on the alleged ground of cruel and inhuman treatment and personal indignities rendering her life burdensome.

The answer denies the allegations, and, for a further defense, avers that, without cause, the plaintiff is quarrelsome, fault-finding and jealous, and is inclined to misconstrue the language and acts of defendant and of others to their detriment. The averments of new matter in the answer were put in issue by the reply, and, the cause having been tried, the plaintiff secured the divorce, was decreed to be the owner of an undivided one third of the defendant's real property, and also awarded the sum of $500 as alimony.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. E. L. Elliott.*

For respondent there was a brief over the name of *Messrs. Stone & Gale,* with an oral argument by *Mr. G. F. Stone.*

For the state there was a brief and an oral argument by *Mr. John Irwin,* Prosecuting Attorney.

Opinion by Mr. Chief Justice Moore.

1. The parties were married December 20, 1906, in Klamath County, Oregon, where they have ever since resided. The plaintiff's daughter by a former marriage lived with them on their ranch about ten miles from Klamath Falls. At the time of the trial, the plaintiff was 47 years old. She had been in ill health for several years, and suffered from an ailment which, in the opinion of her physician, could have been cured by a minor operation. This infirmity with sex frailty at her period of life induced extreme nervousness, which at times prostrated her. Her hearing is also considerably impaired, and, like all persons similarly afflicted, she is quite sensitive on the subject and is liable to misconstrue what is said in her presence. The defendant did not seem to have much sympathy for the plaintiff in consequence of her nervous condition, or appear to accede to her wishes in the general management of their home. Thus, on September 8, 1911, Mrs. Ream, preparing to board a lady teacher, moved a bed from a room which she and the defendant occupied, and had set it up in another room which was occupied by her daughter, when he, returning to the house and seeing what the plaintiff had done in his absence, remarked: "This has got to be stopped right at once. I want that bed. It is coming right back in here." She replied: "No, sir; it is not." He said, "It will," and started toward the door, which she closed. He forced the door open and she took hold of the bed trying to prevent its removal, when he grasped and forced her into a chair, making her wrists black and blue. He admits this encounter, but says

that, when it occurred, the bed had not been set up
in the room to which it had been taken. His chief
reason for such conduct was an objection that Mrs.
Ream was giving to her daughter the best furniture
in the house, reserving for herself and him the poorer
household goods.

The plaintiff testified that on March 24, 1913, she
had been assisting in putting up meat, working so hard
that she was scarcely able to stand, and at the dinner-
table she said to the defendant that other women, after
performing the necessary housework, found leisure for
rest and reading, but she could not do so; whereupon
he informed her that, if she did not get in and do the
work, she would find herself getting up out in the road.
The defendant admits he made this remark, but asserts
it was uttered in their bedroom and was meant by him
as a joke and so understood by her.

Mrs. Ream testified that, after she was ill at the
ranch about four days, the defendant took her to Klam-
ath Falls, and, though she was then suffering severely
and in great agony, he did not inquire if she would
employ a physician or engage anyone to wait upon
her, and that he never called upon her while she was
then ill. She also stated upon oath that, when the
defendant came into their home, he made slighting re-
marks to and about her. She admitted on cross-
examination that she often replied to him in a similar
manner, but that she never employed any insulting
language in response to his disrespectful observations.
She further testified that the defendant told her to
leave his bed and never come near it again, saying:
"I am through with you now and for always." Mr.
Ream stated upon oath that he was in doubt as to
whether or not he made this declaration. He testified,
however, that the plaintiff slept in his room on a cot

until she moved it into another bedroom after a hired girl left. Mrs. Ream further testified that on April 15, 1913, the defendant told her to shut her mouth or he would slap her face, at the same time waving his arms in a threatening manner, thereby causing her to believe he would put his menace into execution. The defendant's explanation of this remark and demonstration is that, a hired girl having left, a letter came to the ranch for her; that he readdressed the envelope, whereupon Mrs. Ream remarked: "You have sent the hired girl away. You want to send my daughter away and then get Mr. and Mrs. Lewis to come here." In reply to this observation he said: "Clara, many men would slap you for that: that is, for what you are saying." "I drew my hand back, but we were six feet apart."

Mrs. Ream's malady and its resulting nervousness undoubtedly tended to make her suspicious. She believed the men employed by the defendant to assist in the farm work were in league with him to annoy her. Thus, on May 15, 1913, when she was visiting at the home of a neighbor, Chauncey Standish, one of the defendant's employees, called and after some conversation said to the plaintiff: "You lie right there. I will make you swallow some of these things you have been saying." She testified that, on her return that evening, she reported what the hired man had said to her to the defendant, who remarked: "I suppose you did lie, or he would not have said so." The defendant stated upon oath that he was not informed of such language on the part of Standish until about a week after it occurred, when he discharged him. The plaintiff testified that, at the breakfast-table, August 18, 1913, the day she finally left the ranch, Harry Blair, another employee, made a slighting remark to her

daughter, whereupon the witness remarked to him:
"You keep quiet and let her alone; she is not saying
anything to you or about you, in any way or shape.
You should attend to your own affairs. You are mix-
ing in family affairs here which you have no right to
do whatever"; that Mr. Blair replied: "You shut your
mouth and tend to your own business"; that Mr. Ream
was present and said to his employee: "Go ahead and
say what you please, I am here"; and that the defend-
ant's remark made her sick.

Mr. Blair, as the defendant's witness, testified that
Mrs. Ream had informed him she was having trouble
and expected to leave the ranch in the fall of 1913; that
on August 18th of that year, the day she finally left,
the defendant told him to say nothing to her; that
at the table Mrs. Ream informed the witness he was
the cause of her leaving; that to this observation the
employee stated: "I am going to tell you what is the
cause of your leaving. It is your untruthfulness and
deceitfulness. That is the whole cause of your leav-
ing." The witness continued: "She called me a big
idiot in two instances." Mr. Ream, referring to the
conversation last detailed, testified that he cautioned
Blair before he went into the house that morning;
that the plaintiff told this employee he was the cause
of her leaving, and that the witness was upholding him.

The plaintiff was jealous of her husband, and prob-
ably this envious suspicion was caused by her illness
and its consequent nervousness and her impaired hear-
ing. She testified that, on April 17, 1913, she discov-
ered the defendant and a hired girl at the ranch in the
separator-room, the door of which was then closed;
that they remained in the room about ten minutes, and,
as he came out, the witness inquired what they had
been doing, to which he replied that it was none of

her business, that he was running the house, and she could keep her mouth shut. The testimony of the defendant and of the girl referred to is to the effect that he went into the room mentioned to repair the separator which he had taken apart for that purpose; that the girl, not knowing he was in that place, entered it to get some potatoes to cook, and seeing the exposed machinery she examined it and for about eight minutes remained in the room, the outer door of which was during all that time open. It is not supposed for a moment there was any impropriety in the conduct referred to. The only thing for which the defendant is at all censurable was his answer to the plaintiff's inquiry as to what he and the girl were doing in the room as hereinbefore specified.

The testimony of the defendant's witnesses tends to show that the plaintiff objected to his playing cards at their home with other women, even when she was engaged in the game at the same table.

It is believed that a fair examination and consideration of all the testimony will show that the plaintiff's temper and disposition were not the best at all times, but that her peculiar temperament was due to ill health which superinduced extreme nervousness, and that her defective sense of hearing also caused misunderstandings; that the defendant, knowing her infirmities, did not extend to her that kindness and forbearance which her then physical and mental condition demanded; that he neglected her when she was sick; and that he addressed language and made demonstrations toward her when she was ill that amount to cruel and inhuman treatment, entitling her to the divorce and to an undivided one third of his real property.

This conclusion is reached without considering any of the evidence that was received upon a motion to open

the cause, after it was submitted, for the purpose of taking testimony as to the alleged conduct of the defendant toward the plaintiff, occurring after the suit was instituted, without filing a supplemental complaint.

The plaintiff asserts the defendant is indebted to her in the sum of about $400 for labor which she performed for him prior to their marriage, and that he also owed her about $1,900 for borrowed money. If these sums are collectable from him, a judgment therefor will, with the payment of his other obligations, so exhaust his property as seemingly to render it inequitable that he should pay to her the further sum of $500 as alimony.

The decree appealed from will therefore be modified so as to eliminate the award of $500, but in all other respects affirmed.                    AFFIRMED.

MR. JUSTICE BENSON and MR. JUSTICE EAKIN not sitting.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

The plaintiff, having been divorced from a former husband, was employed by the defendant for about two years, and then married him December 20, 1906. As she did during her former matrimonial venture, she kept an account of her differences with her husband, which for convenience may be called the book of transgressions, and on September 4, 1913, commenced this suit against him for a divorce, for an undivided third of his real property, and for $2,500 alimony, in gross. The specifications of cruel and inhuman treatment upon which she relies are thus set out in her complaint:

"That on or about the eighth day of September, 1911, at the home of the plaintiff and defendant, near Klamath Falls, in said county and state, the defendant, without any cause or provocation therefor, and while in a violent fit of temper, did forcibly lay hands on plaintiff, pinch her arms, and violently push her into a chair; that, as a result of such attack, the plaintiff's arms were discolored for a long time, and that she suffered great mental anguish.

"That at the same place, on or about March 24, 1913, and while plaintiff was so ill that she was unable to perform the usual household duties and was practically confined to her bed, the defendant, without any cause or excuse, stated to plaintiff that, if she, plaintiff, did not get in and work, she would find herself getting up out in the road; that the effect of such statement was to cause plaintiff such mental suffering as to very greatly aggravate her illness.

"That on or about the fifteenth of April, 1913, when plaintiff tried to induce defendant to refrain from a course of unseemly conduct, the defendant flew into a rage of passion and threatened to slap plaintiff's face; that plaintiff was fearful that such threat would be carried into execution and suffered great mental worry in consequence thereof.

"That on April 15, 1913, defendant, without any excuse therefor, stated to plaintiff that she, plaintiff, was out of his bed and that she would never come near same again, and that he wanted plaintiff to understand that he was through with her for all time.

"That on or about April 15, 1913, near the said home of plaintiff and defendant, the defendant sent one Chauncey Standish, his hired man, to a neighbor's house, where plaintiff was making a short visit, at which time Standish unjustifiably and without excuse, and in the presence of said neighbors, used grossly insulting remarks toward plaintiff, calling plaintiff a liar and using other unbecoming language toward her, and that plaintiff immediately sought the protection of the defendant and informed him of the hired man's inexcusable insults, and that defendant, instead of

remonstrating with said Standish, stated to plaintiff that she did lie or the hired man would not have so accused her.

"That on July 19, 1913, one Harry Blair, said defendant's hired man, entered the home of the plaintiff and defendant in said county, and, flourishing a large loaded revolver in his hand in a threatening and dangerous manner, stated at such time that he carried that gun to protect himself when Ed, meaning the defendant, was gone; that it was sure fire and that he was a good shot. That plaintiff was in a weak nervous condition at such time, was greatly alarmed at such conduct, and suffered great bodily pain by reason of such fear.

"That on or about August 18, 1913, the said Harry Blair, defendant's hired man, at the breakfast-table, in the presence of defendant, used coarse and insulting language toward plaintiff, telling plaintiff that she was a liar, and that at such time defendant told the said Blair to go ahead and say what he pleased to plaintiff, and that at such time and at all other times, concerning which the disrespect toward plaintiff of the said men has been herein described, defendant inspired and encouraged such conduct on their part and made the same his own.

"That, to further vent his spite and hatred toward plaintiff and to add to her pain of mind, defendant has, for a number of years, maliciously taken the hired help into his confidence, told them family secrets, discussed household problems with them, and has repeatedly shown such close intimacy with said household servants as to add very greatly to plaintiff's worry and illness, and that during all of said time defendant studiously and persistently snubbed, slighted and ignored plaintiff, much to her mental distress and impairment of her health; that on the seventeenth day of April, 1913, at the home of plaintiff and defendant, the plaintiff discovered defendant and their then hired girl in the separator-room, the door to said room being closed at such time; on the 22d of the same month, plaintiff again saw the defendant and said hired girl

in the same room, with the door to said room closed; that defendant frequently, immediately prior and subsequent to said last-mentioned dates, drove to Klamath Falls in company with said hired girl and remained all day; that the defendant adopted such a course of conduct solely for the purpose of vexing and annoying plaintiff, and that such acts did greatly worry and annoy plaintiff, so much so that her health has become permanently impaired.

"That, on or about August 10, 1913, owing to the defendant's treatment of plaintiff as herein set forth, the plaintiff's mind was affected to such extent that she became greatly enfeebled in body and, from said date until on or about August 18, 1913, was unable to leave her bed; that during such illness the defendant completely ignored her and never administered to her help or comfort in any manner whatever; that, as soon as plaintiff was able to travel, to avoid defendant's treatment of her, as herein described, and to protect her mind and health from further injury, she was forced to leave the home of plaintiff and defendant and come to Klamath Falls, where she now resides."

Without asking for affirmative relief, the defendant traverses all the charges made by the plaintiff and alleges:

"That since the said marriage of plaintiff and defendant, plaintiff has been quarrelsome, fault-finding and jealous without any cause therefor, and inclined to misconstrue the language and acts of the defendant, their friends, neighbors and employees to the detriment of their domestic felicity.

"That defendant has, at all times, borne the foregoing patiently and has endeavored to pacify plaintiff in her said acts, and to mollify her said disposition to the end, that their said married life might be happy and pleasant, but to no avail."

This new matter having been denied by the reply, the cause was heard on the testimony and the parties rested. Before argument, however, the plaintiff filed

an affidavit to the effect that, since the hearing, she had gone to California and had there received mail forwarded to her from Klamath Falls, which she said she had every reason to believe had been opened, and that, when the package arrived, it contained a note or writing in the handwriting of the defendant in the following language:

"Something on your hands you do not want and had to run away to try and hide it and called it rheumatism. From the ranch."

Without filing any supplemental complaint or other pleading, she sought and obtained permission from the court to reopen the case and give evidence concerning this matter, which, she claimed, imputed to her a loathsome disease and caused her to suffer great humiliation, making her life burdensome, all over the objection and protest of the defendant. The court finally entered a decree granting the plaintiff a divorce and an undivided third in fee of the defendant's real property, together with $500 alimony, and costs and disbursements, from which determination the defendant appeals.

Section 108, L. O. L., says:

"The plaintiff and defendant, respectively, may be allowed, on motion, to make a supplemental complaint, answer, or reply, alleging facts material to the case, occurring after the former complaint, answer, or reply."

Under this section, it has been decided by this court that proceedings, occurring after the pleadings are made up, are not admissible in evidence if not alleged in supplemental pleadings: *Trotter* v. *Town of Stayton,* 45 Or. 301 (77 Pac. 395) ; *Noble* v. *Beeman-Spaulding-Woodward Co.,* 65 Or. 93 (131 Pac. 1006, 46 L. R. A.

(N. S.) 162); *Wagenaar* v. *Beeman-Woodward Co.*, 65 Or. 109 (131 Pac. 1023). As long ago as the case of *Atteberry* v. *Atteberry,* 8 Or. 224, it was held that an assault committed since the commencement of the suit is no ground for a divorce, and in *Jones* v. *Jones,* 59 Or. 313 (117 Pac. 414), this court held that new acts of cruelty must be the basis of a new suit. As a preliminary, therefore, the matter about the alleged interference with the plaintiff's mail must be laid out of the calculation. .

As stated in her pleading and memorandum, the first alleged indignity of which the plaintiff complains happened September 8, 1911, at the home of the parties near Klamath Falls, Oregon. According to her narrative, she was preparing to board the public schoolteacher and was moving a bed from one room into another when the defendant discovered what she was doing, and said: "What does all this mean, indeed?" She told him she "was getting ready to straighten the home up, to get it ready to board the teacher." Her testimony continues thus:

"He says, 'This has got to be stopped right at once.' I says, 'What is the matter with you?' He says, 'It is just this: I want that bed; it is coming right back in here.' I says, 'No, sir; it is not,' and with that he says, 'It will,' and he went in the bedroom, and took the bed all down, and attempted to carry it back in the room it was in. He said, 'You will not take that bed back in there again.' I said to him, 'You will not take that bed back,' and, when he attempted to do so, I took hold of the board of the bed, and tried to restrain him from putting it in the room where I had taken it out. He grabbed me by both wrists, and slung me around, and into a chair, and my arms and wrists were black and blue for two weeks, and, he also hurt my back and shoulder at the same time."

On cross-examination she said she was moving the bed into the room of her daughter by the former marriage. She says her wrists were black and blue for about two weeks, but no other witness mentions the subject. She did not complain to him at the time, but afterward she says:

"I told him that I never saw a husband come into the house and treat his wife in the style and manner that he did me. He simply answered, 'That is all right;' he says, 'I don't want you to bother it.'"

The defendant's account is that he had bought a new bedstead for their room and had given her to understand that he wanted it to remain there. He then says:

"She took advantage of my absence one day to remove it into her daughter's room, that was to the opposite bedroom, to change one bedstead to the other room, and I happened to come into the house just after she had exchanged the bedsteads. She had the habit, offhand, to put all of the old furniture in our room, and the new furniture in the girl's room, and I had remonstrated with her on the matter, and was pleading for her cause just as much as my own. I told her we were getting old in years, and I pleaded of her to take a little comfort for ourselves. I started to go in the bedroom, and at that time she closed the door on me, and held it, resulting in me forcing the door open. The door opened into the bedroom. * * She was in the bedroom sweeping at the time, and she held the door. I forced the door open, and she still put up a scrap to prevent me from taking hold of the bedstead. I just took her by the arms, and got her outside, and sat her down in a chair in the kitchen. I did not use any more force than was necessary to accomplish that act, and then I proceeded to put the bedstead back, and set it up in my and her bedroom, and asked her to let it stay there, which she did."

He states further that she made a pallet on the floor at the foot of the bedstead and slept there that night, and the next night when she attempted to go to bed there—

"I told her good-naturedly, I said, 'Clara, that is all foolish, you acting that way.' I says, 'You know one thing, you can't rest, and you can't sleep.' I says, 'Get up in the bed here, where you can rest,' and she did so. She did not say anything about it; she just got into bed."

The pleadings do not reveal any untoward event, until about two and one-half years later, when occurred the incident of March 24, 1913. From that time forward, according to the jeremiad of the complaint and the book of transgressions, the plaintiff was like the "unhappy master whom unmerciful disaster followed fast and followed faster," for all her woes happened between that date and the 18th of the following August, when she packed up her belongings and left the defendant. In answer to the question: "What was the nature of that?" referring to the affair in March, she gives the following extremely condensed account:

"He told me at that time, on that date, that if I did not get in and work, I would find myself getting up out in the road."

She locates this transaction at the dinner-table. On cross-examination she enlarges upon the subject in this language:

"He just said—we was talking about butchering, putting the meat away, we had two big hogs—and we had put all of that meat away, and made lard, rendered it out, made sausage, and cleaned up everything, and this was a short time after that. We talked about it at the dinner-table one day, about neighbors that had been butchering a lot of hogs, and I said it was so nice for that lady. I spoke about the neighbor that she

does not have any of that kind of work to do in the house, and I says, 'Her husband is kind to her, and he takes all that work outside, and keeps it out,' and, I says, 'When she gets her work done up,' I says, 'She has a little time for something else besides working all of the time.' I says, 'She likes to read real well,' and he says, 'You act like that, or do that, you will find yourself getting up out in the road.' "

The defendant's narration of this affair is this:

"The time I made that statement to her, she was lying in bed; I had been sitting on the bed, and had been joshing her good-naturedly, and she was joshing me in a friendly way. I was not mad, nor she was not mad, and when I got ready to go out, I just made the assertion, in a joking way, if she didn't get up, she would find herself coming up out in the road. There was no ill feeling between us; it was all said in a joking way."

He says that she did not cry, remonstrate nor make any objection whatever to this statement.

The next chapter opens April 15, 1913. Of that she tersely says: "He told me at that time to shut my mouth or he would slap my face." On cross-examination she explains her statement of this clash in the following language:

"He came into the house, and he spoke about me doing some work, or something that was to be done there. I told him I had not had the time to do it yet; I had been busy all the whole time, as busy as I could be, and he said, 'That is just like all your work amounts to.' He mentioned one time, not there, 'What you do never amounts to anything, anyway.' I said my work amounted to enough to save him at least $20 a month expense, if it was not very much. I told him, at the time he had hired help, he paid them all the way from $35 to $40 a month, and he says, 'That is all right on the side,' and he said to me, he says, 'That is all right; when I want help, I will have

it.' 'Yes,' I says, 'that is all the respect you have for me.' I says, 'You have just as much respect for me as you have for an old nigger servant, if you had one in the house.' I says, 'You would show them more respect than you would me, for you would go up to them, and slap them on the back, and give them kind words and a pleasant smile once in a while, but you have not me.' That is when he walked to me, and drawed his hand back, and told me to shut my mouth, or he would slap my face.''

The defendant's account of this affair is this:

''We was standing, or, rather, I was on the porch, and she came out on the porch, and asked me why the hired girl had left, meaning Miss Halousek. She had went a few days before, and went to Malin, California, or Oregon, I guess, and I told her I did not know. She says, 'You do know;' and she referred to a letter that did come for the young lady, and she had been gone several days, and I did not think she was coming back, and so I scratched out the address Klamath Falls, and put Malin on it, intending to hand it to the stage-driver, and send it to Malin, where I supposed she was, and my wife understood by that that I had sent the girl away, and, knowing also she was not coming back, had attempted to send this letter to her. I remonstrated with her, and told her, 'No, I had not done so, and that I did not think the girl was coming back, and that was the reason I thought of sending the letter to her. During our controversy over this question, she said several times that she knew very well that I did send the girl away; that I wanted to get her and her daughter away so that I could have Mr. Lewis and his wife up there, intimating that I wanted them there for Mrs. Lewis to keep house, and Mr. Lewis to work on the ranch. I remonstrated with her, and told her she was wrong, there was no truth in it, and she would not say anything, or listen to anything, and abused me.' I says, 'Clara, many men would slap you for that, that is, for what you were saying.' Those are the exact words I said.''

He said, although he drew his hand back, he did not attempt to nor make any movement as though he intended to strike her, and that they were six feet apart at the time.

The next grievance is alleged to have happened on the same date. The plaintiff says the defendant told her then to leave his bed and never come near it again, and imputes to him this language: "I am through with you now, and for always." The defendant makes this the outgrowth of the controversy about the bed already mentioned. He said:

"She moved a canvas cot into the bedroom, and made her bed on the cot, at the foot of my bed, and I told her my idea, and remonstrated with her as long as she had a bed she could rest on, and she slept there on that cot the remainder of the time that the hired girl was there. I don't just remember how long that was now."

He says that, after the hired girl left, the plaintiff moved into the other bedroom.

She complains also that about August 10th, she was in bed four days on account of illness, and that the defendant did not come near her nor ascertain whether she needed any medical treatment or medicine. The husband explains this by saying that the plaintiff and her daughter had the habit of doing up the housework, then going into the bedroom, closing the door, and not talking to him at all; that the meals were eaten in silence; that the plaintiff would push her plate over to the far corner of the table as far as possible from the defendant and would not notice him or talk to him; that she would not even do his laundry work, so that he was obliged to take it to town; and that for these reasons he did not force his attention upon her during the four days she mentioned, which were

just prior to her departure; but that he would have willingly provided for her, had she made known any wants. His explanation is not in any way challenged or denied by the plaintiff or any witness on her behalf.

In support of her charge against him for taking the hired help into his confidence, she says:

"He took them into his confidence in this way: Whenever he came into the house, he would go to them for everything that he wanted to; it did not make any difference if it was about his business or what; he would almost tell them when he was going to town, and when he would come back."

Her specifications in regard to the defendant's relations with other women, are found in what we call, for convenience, the incident of the separator-room. The defendant had a milk separator in a room adjacent to the kitchen of the premises, adjoining which was a pantry. Between the latter and the separator-room was a door. Another door from the separator-room opened to the outside. The plaintiff, the hired girl and the defendant, according to the former's statement, were all in the kitchen. The defendant went into the separator-room. The plaintiff gives this account:

"He come into the house, and she was in the kitchen; he passed through the pantry into the separator-room. She followed him in there, and they was there for as much as at least ten minutes. When I seen them go in the door, I stepped into the pantry just outside of the door. As quick as she opened the door and stepped out, she saw me standing there. Her face turned crimson, and she threw her head back, and walked past me out in the kitchen. I was standing right where I could see Mr. Ream, and he looked up, and saw me standing there, and blushed and dropped his head, and did not say anything at that time, and he walked out in the kitchen, and very soon he came

out. As he passed before the door going outside, he shouldered the girl, and, grinning, walked on outdoors.''

She states that she didn't have any words with him at that time, but afterward she says:

"I asked him what he was doing in there with Madge; why it was that he would act that way in my presence. He said it was none of my business; that he was running the house, and I could keep my mouth shut.''

Supplementing this, her complaint says that the "defendant frequently, immediately prior and subsequent to said last-mentioned dates, drove to Klamath Falls in company with said hired girl and remained all day.'' The hired girl in question testifies that she never went to Klamath Falls or any other place alone with the defendant, and he tells the same story. He says the girl was never off the ranch with him anywhere, much less coming to town. Defendant's account of the transaction in the separator-room is in this language:

"Why, the separator had got out of order the day before, and we could not use it. The bowl got so wobbly we could not use it. We had to set the milk away in pans in the milkroom, and the next day—that same day—I had taken the bearings out, those ball bearings out, and cleaned them, as I thought thoroughly, and had to put them back, and that did not remedy the defect. The belt wobbled just the same, necessitating that I take them out again, and give them an entire overhauling, and that was the time I was in there, working on the separator, and I had some jugs, buckets, there with water in them, and was sitting close to the door. Miss Halousek came in after some potatoes, and, when she opened the door, the door struck against the bucket and she says, 'I did not know you were in here'; she seemed surprised. I moved

81 Or.—13

back, and she opened the door and came in, and got
her potatoes, and I spoke to her about the separator.
I had the name plate off the separator, I exposed to
view, and some screws, and stuff in there that she had
not seen.   She spoke about what—she says, 'I will get
some hot water to clean them up,' and she turned to
go out, and as she opened the door, my wife was stand-
ing at the side of the door, where the door is hung on
against the hinges, leaning kind of against the door,
listening.   That is the first I knew she was there.''

He says the outer door of the room was open be-
cause he had to have light to work on the machine.
He denies shouldering the girl or making any signal
to her as he walked out of the room.   The girl testi-
fies that she went to the separator-room to get some
potatoes kept there for household use, and, while
there, the defendant called her attention to one part
of the separator not being clean, and she immediately
went into the next room and found Mrs. Ream there.
In all her testimony about this affair, the plaintiff
does not impute to the defendant any wrongdoing.
All through her narrative, however, runs a vein of
jealousy for which no foundation is disclosed.   In all
her discourse about the defendant's actions toward
her, she is not supported by any other witness.   In-
deed, besides her physician, who speaks only of the
state of her health, and Mrs. Lewis mentioned further
on, the sole witness on her side of the case was one
Schumacher, who afterward married the plaintiff's
daughter.   He says the defendant forbade him to
come to the ranch.   The witness thus relates the
defendant's language:

''And he said it was well to stop off the ranch at
the present time, and he said he would rather I would
not come again, so he told me, he says, 'Of course, the
way things are going on, I am going to have my way.'
'After a while,' he says, 'I can't kick them out'; he

says, 'I wish they would go away with you when you go away,' " referring to Mrs. Ream.

The witness further said the defendant told him he was not going to live with the plaintiff again.

Another affair upon which plaintiff counts may be denominated her quarrel with a hired man named Standish. According to the book of transgressions, this happened May 15, 1913. The plaintiff's story is that she had gone to spend the afternoon with Mrs. Lewis. She goes on to state that Standish came to the Lewis residence, and she says:

"He called at the door, and he said, 'I came to borrow the cutter'; he said to her, he said, 'Did you tell Madge [that was the hired girl] that Mrs. Ream said for her not to have anything more to do with me?' She said, 'I did not.' When I heard my name mentioned, I went to the door. He turned from the door, and said to me, 'I thought, the other day, I thought you respected Madge,' and that I said she was a nice girl; I said, 'I did say so, and say so now.' He said, 'Yes, you do'; he said, 'You lie right there.' He said, 'Why did you raise such a kick when her and Mr. Ream went into the separator-room, or into the cellar and close the door?' He said, 'It looked like you respected her, trying to make out she was not the right kind of a girl.' Then he took off his glove, and looked and talked very angry; he said, 'That is just like the women; they will say one thing and another one minute, and then deny it.' He says, 'We will have this straightened up'; I says, 'Yes, indeed we will.' He took off his glove, and swung his hand about, and he said, 'I will make you swallow some of these things you have been saying'; then he turned and walked away."

This is her testimony in support of her allegation that Standish called her a liar. Mrs. Lewis narrates the matter thus:

"While Mrs. Ream was paying me a visit, Chauncey Standish called and said he wanted to borrow the cutter; he meant the disc, and that is what he got. He also said, 'Did you tell Madge that Mrs. Ream said for her to have nothing to do with me?' I said, 'I did not.' He said, Mrs. Ream not hearing well, he said, 'There is a lot of other things that is being told up there, and I am going to have it straightened out,' and Mrs. Ream, on hearing her name called, came to the door also, and he stopped talking to me, and turned to her, and he said, 'I thought you said you considered or thought Madge was a respectable, nice girl, and a good girl,' and she said, 'I do; I did, and I say so now; I think Madge is a nice, good girl,' and he jerked off his gloves, and shook his head, and really looked angry and mad, and he said, 'This is like a lot of other things you are telling and denying, and that is the kind of a woman you are; you say one thing one minute, and you deny it the next, and I will have a straightening up of things,' and Mrs. Ream said, 'Indeed, I will; I am ready any time,' and he says, 'You bet, I am going to make you swallow a few things you have been saying,' and then he turned and went away."

Standish speaks of going to the Lewis house to borrow a disc harrow, and then says:

"In the meantime, I thought I would ask Mrs. Lewis if such had been told to her, and I asked her if Madge had ever told her that Mrs. Ream told her not to have anything to do with me, that I was not the right kind of a man, something to that effect, and she said, studying a few minutes, and said she believed she told it. Mrs. Ream denied it at the table that day, and then she heard me talking and came and said she did say it in a way, and a few words passed, and I said, 'This whole thing will have to be straightened up, or I would like to have it straightened up.' I think that was about all that was said."

There is not a syllable of testimony showing that the defendant authorized the conduct of Standish or

even knew anything about it until afterward. The plaintiff says she told him of it that evening. The defendant testifies that it was not mentioned by her until a week or ten days afterward; that he first learned of it from Standish; that he then remonstrated with him and told him he should not have done so; that afterward, when his wife spoke to him about it, he inquired why she had not told him right away, to which she replied that it would not do any good, and he supposed it meant there was no use of kicking up any row about it any further, so he paid no more attention to it. Standish says:

"I spoke to him about it, and told him that I had a little trouble with Mrs. Ream in regard to this, and he says, 'You ought not to have done it'; he says, 'You done wrong,' and it looked very much like he was out of humor, and says, 'That will only make trouble start.' "

Soon after his wife complained of the conduct of Standish, the defendant discharged him.

Again referring to the book of transgressions, we find that the plaintiff, according to her story, had two altercations with another hired man named Harry Blair, the first on July 19, 1913, and the last on August 18th of that year, the day she left the defendant. Of the first she says:

"On July 19th, he came into the kitchen, flourishing his revolver in his hand. He says, 'This is what I use to protect myself when Ed is gone' [meaning Mr. Ream]; he says, 'That was a good shot,' and he says, 'I am a good marksman, too.' He swung himself around in a threatening way just like, 'If you don't do as I want you to do —' and he put it in his pocket and walked outside."

Her account on cross-examination is as follows:

"Q. How about that instance that you allege he came in flourishing a revolver—will you tell us about that?

"A. Yes, sir. He had been in Mr. Ream's room, dressing to go to town. He came into the kitchen, and he reached in his coat pocket, and pulled a revolver out and held it in his hand. He walks toward the table, and begin to shooting the cartridges out on the table, and all over the floor, and I says, 'That makes me nervous for you to do like that,' and he said he wouldn't do it again. I says, 'It was against the law to carry firearms,' and he says, 'No, that is all right.' He kept shooting, and working with it, and showing me how he could fix it so it would not shoot; he pulled a spring in his revolver, and showed me that way he could fix it so it would not go off when he did not want to use it. He says, 'I just tell you that is a good shot, and I am a good marksman; I had that to protect myself on the ranch when Ed is gone.'

"Q. Did he shoot those cartridges off there in the room?

"A. How is that?

"Q. You say he shot those cartridges there in the room?

"A. He was shooting them out of the revolver on the floor; a lot of them fell on the floor and table, scattered them all over.

"Q. Let me understand, you don't mean that he was firing the cartridges, simply throwing them out of the gun?

"A. Throwing them out of the gun on the floor and the table.

"Q. How many did he throw out, if you know?

"A. I think there were eight.

"Q. Describe along here, what sort of a looking gun was it?

"A. It was a revolver, about that long (indicating), black and nickel trimmings.

"Q. Just an ordinary, common revolver?

"A. Yes, sir.

"Q. Did you ask him to let you examine it?

"A. He said, 'I had that to protect myself on the ranch when Ed is gone.'

"Q. Did you ask him to let you examine it, look at the gun?

"A. No, sir; I did not by any means.

"Q. Did you take the gun in your hand?

"A. No, sir; I did not."

She says she never mentioned this revolver incident to the defendant at all, and he says he never heard of it until he saw it in the complaint. The August jangle happened after the plaintiff and her daughter had packed up their things and were prepared to permanently leave the defendant's home, which they did that very day. The parties, plaintiff and defendant, her daughter and Blair were all at the breakfast-table. She gives this account:

"August 18th, he was sitting at the table eating breakfast, and my daughter, she looked up at him, just glanced up at him, and he says, 'Why do you look at me in that style and manner for?' He says, 'You are looking at something, or doing something you had not ought to do.' I says to him, I says, 'You keep quiet, and let her alone.' I says, 'She is not saying anything to you, or about you, in any way or shape'; I says, 'You should attend to your own affairs.' I says, 'You are mixing in family affairs here, which you have no right to do whatever.' He says, 'You shut your mouth, and tend to your own business.'

"Q. Was Mr. Ream present at that time?

"A. Yes, sir, he was right there at the table.

"Q. Did he make any statement?

"A. He told him to go ahead and say what he pleased; he said, 'I am here.'"

Blair testifies as follows:

"I come in the house, but, before I come in the house, Mr. Ream said, he says, 'The women have told me that you are the cause of them leaving to-day, and, if they say anything to you, I would rather you not say any-

thing at all, and try to get along with them, if you can, because I think they intend to leave this morning. They have all their things packed.' I intended all right to keep still, but when I went in the house, and we sat down to the table, Mrs. Ream and her daughter, Nieta, was at the table already, and the daughter, Nieta, made a remark to her mother, or Mr. Ream, I don't know which, she looked from one to the other, and then looked at me, and had a frown on her face. I says, 'What is the matter with you now? What are you looking at me in that manner for?' I says, 'What have I done—something wrong? Have I hurt your feelings?' something like that, and I says, 'I would rather you would not look at me that way,' and I says, 'If you can't look at me any different than that, I wish you would look the other way,' and Mrs. Ream was eating at the time, and when she looked up and saw me in a conversation with Nieta, I was carrying my part of the conversation, but she was not saying anything, and she said, 'You better keep still and leave her alone, not say anything to her.' 'Well,' I says, 'I am going to defend myself, if anyone is doing me wrong,' and I says, 'I have got to do my part of it.' I says, 'By the way, Mrs. Ream, your husband tells me this morning, I am the whole cause of your leaving here,' and, I says, 'You had an intention, I believe, before ever we became acquainted. As far as that is concerned, I have nothing against you now, but I don't like to have you charge me with being the cause of your leaving here.' 'Well,' she says, 'you are the cause of me leaving here; you are a big idiot.' I says, 'All right; if I am the cause of your leaving, I am going to tell you what is the cause of your leaving.' I says, 'It is your untruthfulness and deceitfulness, Mrs. Ream, that is the whole cause of your leaving,' I says, 'It is nothing else but that,' and she repeatedly told me to keep my mouth shut, called me a big idiot in two instances."

He flatly denies calling the plaintiff a liar and affirms that untruthfulness and deceitfulness were the only

words he used in regard to her. He further speaks
thus on oath:

"Q. What did Mr. Ream say, if anything?

"A. He told me I had better keep still about this
matter; he says, 'I don't want to have any more trouble
with them, that is, my own help, because,' he says, 'it
is bad enough as it is,' and he said, 'If you keep still,
I think later on this thing will blow over and very
little done.' He says, 'I don't want to have any
trouble with them.' I says, 'I will tell you, Ed, that
is up to you'; I says, 'I ain't going to let anyone talk
to me like that.' 'Well,' he says, 'I told you what I
wanted you to do, and would rather you did it.' Me
and he, of course, had a little spat about that. It was
halfway around out of the house, and he told me, he
says, 'I told you to keep your mouth shut, and why
didn't you do it?' I says, 'When a woman tells me
I am wrong, I think a man's obligation is to defend
himself,' and I says, 'I did not say anything to her,
only what was the whole truth.'

"Q. State whether or not, Mr. Blair, at this time,
Mr. Ream made the following statement, or words to
this effect: 'You go ahead and say what you please.'

"A. He did not; no, sir; he made no such remark at
all, because I remember the only single instance of this
case."

Apropos of the plaintiff's real estimate of Blair,
there was read into the record an extract from a letter
written by Mrs. Ream to Miss Halousek, July 25th:

"Harry is still with us; and he is a good boy to
work; we like him better all the time, as he takes so
much interest in the stock and work of all kinds."

The defendant says that on this occasion:

"I cautioned Mr. Blair before he went into the house
to breakfast. I told him the circumstances, that they
had their stuff all packed, and ready to leave, and I
supposed they was going away that day, and cautioned

him to be quiet, and not say anything—not kick up any row.''

Speaking of the grievance at the breakfast-table, he says:

''She did not say anything [referring to the girl], and her mother then told him to mind his own business, and I asked him to keep quiet at the table—be quiet and not say anything. I did not consider that he had said anything out of the way then to anyone which I considered to be offensive.''

He denies that Blair called his wife a liar, or words to that effect. He testified that:

''Blair told her, 'I understand that you blame me, that I am the cause of your leaving here,' or words to that effect, but he did not say lying or anything of that kind. I says, 'Keep quiet, Harry, and let this thing blow over.' ''

Although the plaintiff's daughter was present at this altercation, she was not called as a witness. As witnesses for the defendant, there were two young women who had worked there and a school-teacher who had boarded in the family. One of the girls testifies that the plaintiff, besides being jealous of the defendant, said he talked too much to the schoolmistress, but the witness declares that the whole conversation was in the presence of all the family and about school matters. This girl, May Hajicek, declares on oath that, on one occasion, while she was at work in the kitchen, where the defendant was shaving, the plaintiff came in from the pantry and angrily slapped a spoon down upon the table. She says she immediately left the room and started to pack her things, when Mrs. Ream came to her and apologized; that the daughter also came in and sought to mollify her; and that the plaintiff said, ''I can't help it; he has been

talking to May all morning.'' This witness also states that at different times the plaintiff would not speak to the defendant. She says she once went to town alone with Mr. Ream between 8 in the morning and 4 in the afternoon. Her parents lived there, and, immediately on arriving at Klamath Falls, she went to her home and spent the day with her family, returning to the ranch later in the day.

The other hired girl, Madge Halousek, states on oath that the plaintiff acted coolly toward the defendant and would not talk to him; that she herself had been warned before she went there to work that the plaintiff was jealous, and she took care not to have any more conversation with the defendant than she really had to, and that nothing improper ever occurred between them. The schoolmistress who boarded there said that the defendant was kind to the plaintiff and was all a husband ought to be; that on the other hand, the plaintiff was in the habit of finding fault with the defendant, and that the witness came to town only once and returned with him. Both she and the other lady witnesses testify that, at all other times when they went to town in company with the defendant, the plaintiff and her daughter and others were in the same conveyance.

In addition to what has already been quoted from the plaintiff's own testimony, concerning her affrays with her husband, she says he would make slighting remarks every time he came into the house. Her examination includes the following:

''Q. What did he say?

''A. I don't remember what he said in words. I talked to him about the same as he did to me. * *

''Q. When he talked to you in that way, you talked back to him in the same way?

"A. I would not answer him back lots of times; it hurt me so bad, I couldn't. * *

"Q. Generally, you answered him in that same way, didn't you?

"A. I did not understand, not always; I said I didn't."

She says, "I told him that he acted pretty fresh toward other women," and she accused him of being too familiar with May Hajicek. The defendant says she had the habit of nagging him about other women, whom he mentions, and accusing him of being too familiar with them. She does not dispute, but rather corroborates, him on this point. Moreover, there is not a line of testimony showing any unchastity or impropriety on his part with any woman. He said he was always pleasant to her when she would talk to him, and that he provided well for her. She says herself, "He is pretty good for providing. I can say that about him, and he can have that much more."

The testimony shows that the plaintiff's hearing is impaired, that she was sensitive about this infirmity, and that it intensified her suspicions of other people because she could not always understand what was being said. This, together with her alleged nervous temperament, throws light upon her conduct toward her husband but does not justify it. As stated before, the only witnesses for the plaintiff, besides her physician, who speaks only of her physical condition, are plaintiff herself, her son-in-law, Schumacher, and Mrs. Lewis. Schumacher does not give any account whatever of any misconduct by the defendant toward the plaintiff. A *résumé* of the situation shows that the relations between them were becoming strained, and the remark made by the defendant to the son-in-law expressed no more than the wish that the affair was

ended.   Mrs. Lewis speaks only of Mrs. Ream's affair
with Standish.

The plaintiff cites, as authority for making the de-
fendant responsible for her altercations with Standish
and Blair, the case of *Hall* v. *Hall,* 9 Or. 452.   There
the parties had had an antenuptial agreement to the
effect that if the plaintiff married the defendant the
latter should provide for his two daughters elsewhere,
and not keep them in their home.   In spite of this,
he not only refused to observe the agreement, but
made no attempt to control his daughters in their in-
sulting demeanor toward their stepmother.   The court
held that, because of his breach of the stipulation and
his refusal to attempt to restrain them, he adopted
their acts as his own.   Here, the case is entirely dif-
ferent.   The defendant remained in utter ignorance
of the pistol incident with Blair until he read it in the
complaint.   He was not present at the quarrel with
Standish, and knew nothing of it until some days after-
ward, when he reproved Standish and soon discharged
him.   According to the weight of the testimony, the
only fault that the plaintiff could find with her hus-
band, respecting the altercation with Blair at the
breakfast-table, was that he did not affirmatively es-
pouse her side of the quarrel in which she engaged
with the hired man.   We must remember that the
plaintiff at this time, by the undisputed testimony,
had for a long time refused to talk with the defend-
ant, had treated him coolly, had given various evi-
dences of her jealousy, without any foundation for the
same, and even then had packed her things and was
ready to leave him.   Notwithstanding all this, the de-
fendant cautioned Blair in advance against making
any trouble and, as they both state, reproved him at
the time and told him to keep quiet at the table.   It

is noteworthy that the daughter of the plaintiff was present at the time, yet she is not called as a witness. The defendant is in no way responsible for or chargeable with the conduct of either Blair or Standish toward the plaintiff. He was not a party to it, did not countenance it, reproved both of them, and discharged Standish. As the plaintiff was even then prepared to leave, it was not necessary for the defendant to send Blair away, especially as the plaintiff had opened the quarrel with him.

Conceding that the two parties are of equal credibility, they differ so materially in their statements of the different altercations that it is plain the plaintiff has failed to make out her case by a preponderance of the testimony. All the disinterested witnesses who speak on the subject accord to the defendant kind treatment of his wife and impute to her jealousy and faultfinding. Even her own daughter, though a member of the family, at the times mentioned in the complaint, did not appear as a witness in support of the plaintiff's contention. In the plaintiff's own account of the row about moving the bed, she appears to have been a participant in a mutual affray. The defendant had bought the bed for their own personal use and had told her that he wanted it to stay in their room. He had fully as much right to use the bed he had purchased as she had, and it was in flagrant disregard of his legitimate wishes that she undertook to move it. When he protested, she engaged in combat with him and was simply vanquished. She is not blameless in that affair.

Again, in the occurrence of March 24th, he says that he was simply joking her. According to her own statement, she, at that time, was drawing unfavorable comparisons between him and the husband of the

neighbor woman.  Likewise, in the wrangle of April
15th, when she says 'he threatened to slap her face,
that was language used in a mutual quarrel in which
she said to him that he had as much respect for her as
he would have for an old nigger servant, etc.  Again,
in her sulks about moving the bedstead, she refused
to occupy the same bed with him; made her pallet on
the floor; later on, carried a cot into the room and
occupied that until the hired girl left, when she moved
into the room the girl vacated.  Her conduct toward
him in refusing to speak to him and contemptuously
moving her plate away from him at the table indicate
that she was quite as much to blame for the misunder-
standing between her and the defendant as he was.

Our own precedents are not silent on this subject.
In *Beckley* v. *Beckley,* 23 Or. 226 (31 Pac. 470), Mr.
Justice MOORE says:

"It is not every threat uttered, while smarting un-
der real or imaginary slights, or prompted by the
pangs of jealous rage, nor overt acts of violence, even
committed in the heat of passion caused by the aggra-
vation of the other party, that constitutes cruelty.
There must be an intention to worry the other, and
this may be successfully accomplished without a single
threat and in the absence of any act of violence.  The
studied sneer, the willful neglect or the careless dis-
regard of the other's wishes may, and often does, en-
danger the health of the injured party.  Cruelty is a
question of intent—a mental purpose to wound the
feelings of the other party."

This language very properly characterizes the con-
duct of the plaintiff in her demeanor toward her hus-
band, in her refusal to speak to him or to occupy the
same bed with him, in her petty espionage upon him,
in her nagging him about other women without any
reasonable cause, and in making comparisons between

his conduct and that of other husbands to his detriment. Such conduct would be maddening to any man of spirit, and was doubtless designed for that purpose by the plaintiff. The conduct of the defendant is not to be approved; neither can we wonder at it; but fairness compels the observation that the demeanor of the plaintiff did much to provoke it. The case would be a close one and the issue narrow if we were called upon to determine which of the twain was the greatest offender against the peace of wedlock; but that is not the question to be decided. Our own former utterances declare a different principle. In the *Beckley Case* the opinion continues:

"To entitle one to a decree of divorce for cruel and inhuman treatment, the injured party must come into a court of equity free from the suspicion that he has contributed to the injury of which he complains. Divorces should not be granted by weighing the evidence and decreeing in favor of the one least guilty, where both have taken an active part in the mutual discord. Equity relieves the injured party, but not the vanquished. In the struggles for supremacy, or to vent spleen, spite or hatred, the willing actors may fight out the battles of wedded life, but they cannot invoke the aid of equity after their own efforts have failed."

The same writer in *Jones* v. *Jones,* 44 Or. 586 (77 Pac. 134), held that, where the plaintiff was a willing and active participant in the quarrels and assaults of which she now complains, she is not entitled to a divorce. The following precedents are to the same effect: *Taylor* v. *Taylor,* 11 Or. 303 (8 Pac. 354); *Adams* v. *Adams,* 12 Or. 176 (6 Pac. 677); *Wheeler* v. *Wheeler,* 18 Or. 261 (24 Pac. 900); *Mendelson* v. *Mendelson,* 37 Or. 163 (61 Pac. 645); *Crim* v. *Crim,* 66 Or. 258 (134 Pac. 13); *Matlock* v. *Matlock,* 72 Or. 330 (143 Pac. 1010). In *Rowe* v. *Rowe,* 84 Kan. 696 (115 Pac. 553), the court says:

"Where words alone are relied on, it must appear that they were uttered, not merely as complaints against the misconduct of the other, real or apparent, but that they were uttered without justifiable cause and for the purpose of inflicting pain."

Out of her own lips, plaintiff has given an account of conduct on her part that would exasperate any man and provoke the language of which she complains. Clearly, she is to blame, in her relations to her husband as stated in *Beckley* v. *Beckley,* 23 Or. 226 (31 Pac. 470). Her compilation of the book of transgressions is not indicative of a heart crushed and wounded nigh unto death; but, rather, it reveals a cold and calculating disposition, biding its time, and determined finally to maneuver its prey into the snare. We cannot apportion the wrong between two parties, both of whom are at fault. Not having come into court with clean hands, the plaintiff is not entitled to relief in chancery. In view of the shortcomings of the plaintiff, the amercement of the defendant to the extent of one third of his realty would be inflicting a penalty out of all proportion to the *quantum* of his offending. To grant her a divorce according to the prayer of her complaint would be practically to confiscate the defendant's property, and thus capitalize her for another matrimonial venture, in which she could open a new set of books regarding her marital grievances with a view of increased pecuniary gains in future divorce litigation.

The decree of the Circuit Court should be reversed and the suit dismissed.