GEORGIA S. HALL, Appellee, v. GUY H. HALL, Appellant.

**Divorce:** INHUMAN TREATMENT: EVIDENCE. A divorce should not be granted except upon one of the statutory grounds, and then only when established by the evidence. Evidence that defendant's alleged cruel treatment of his wife consisted largely in objections to her attentions to another man, and the only evidence of the effect of such treatment was that it increased a nervous trouble which she had before marriage; that she was subject to serious nervous headaches, and that she was a nervous wreck, was not sufficient to show that defendant's conduct had endangered her life; and plaintiff was not entitled to divorce on the ground of cruel and inhuman treatment.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

SATURDAY, DECEMBER 13, 1913.

SUIT for divorce on the ground of cruelty. There was a decree of divorce, and judgment against defendant for $1,000 alimony and $600 additional attorney's fees. Defendant appeals.—*Reversed.*

*Hunn & Jones,* for appellant.

*Mulvaney & Mulvaney* and *Walter McHenry,* for appellee.

PRESTON, J.—The marriage ceremony between these parties was performed May 14, 1906. In one of plaintiff's daily letters to defendant shortly before the ceremony plaintiff concluded: "Yours till death do us part, Georgia." This was after the engagement had been broken a few times and renewed. Since the marriage both parties seem to have interpreted their marriage vows that they would take each other for better or worse, until death, to mean that they would do so for better, and if it turned out worse, then it would be until one or the other should obtain a divorce. There are no children; they discussed that subject before the marriage, and made preparation to prevent having them. Defendant is about thirty years of age; is the assistant cashier and confidential man in a banking institution; he is a reader, and has a good library. She is a little older than he, and is a musician of some prominence. They had been school children together, and had known each other for about twenty years. The courtship began when they were about eighteen or nineteen years of age. He claims she is inconstant and changeable. The engagement was broken at least a few times, and he claims she would break it every time she became angry. They are intelligent and reasonably prosperous. They own their own home, which was well furnished. Conditions were such that it would seem that they should have been happy in their married life, and they were

reasonably so until about 1909 or 1910, when the matters hereinafter referred to occurred. In the fall of 1910, she went from Dallas Center to Des Moines, and entered the Conservatory of Music of Drake University. She continued her studies there until a short time before this action was commenced, returning occasionally to Dallas Center, where her husband remained. About this time, or perhaps a short time before, she formed the acquaintance of a young and attractive physician in Des Moines, who is a distant relative of defendant, but this physician and defendant and their families were not on friendly terms. Defendant claims she became infatuated with the doctor. In May, 1911, the parties entered into a written agreement, binding themselves to live separate and apart from each other for a period of two years. At that time defendant paid her $500 and paid $100 attorney's fees. She took possession of and removed the household goods. Defendant kept his part of the agreement. This action was commenced about three months after the making of the contract. The record is somewhat lengthy, but such, in brief, is the history of the case. Many of plaintiff's letters are copied in the abstract, and take up about sixty pages. It is a most unfortunate situation. If these parties had properly appreciated their duties and responsibilities, and had shown some consideration for each other's feelings, with some forbearance for each other's frailties and shortcomings, and had made an honest effort to perform their marriage vows, their troubles could have been avoided. The trial court, by its decree, gave her $1,000 alimony and $600 additional attorney's fees, $300 to Mulvaney & Mulvaney, and $300 to Walter McHenry. Plaintiff was allowed $150 suit money in this court. This makes a total of $2,350 paid by, and allowed against, the defendant, in addition to the household goods. His total property is about $4,200; $2,500 of this is the homestead, and $1,700 of it on deposit in the bank. His salary is now about $1,300 per year.

The plaintiff introduced testimony and attempted to

prove the following things, as constituting cruel and inhuman treatment: (1) That he was guilty of improper conduct with a woman in Cedar Rapids, in June, 1911, while he was attending a Grand Lodge meeting; (2) that defendant had a bad temper and morose disposition; (3) that he brought certain objectionable pictures to their home; (4) that he practiced a degrading and secret vice; (5) that he was jealous of Dr. Parriott.

As to the first point, a witness did testify to circumstances tending to sustain the charge. The trial court found against plaintiff as to this, and the evidence for defendant is so conclusive that it did not occur that we shall not further notice it.

Plaintiff testifies that defendant has an ungovernable temper, and is morose and sullen in his disposition. Instances are testified to by her, but these are denied or explained by the defendant. There was a long engagement, before marriage, of six years. The matters complained of are generally of the same character as those occurring prior to the marriage, and of which plaintiff had knowledge. Plaintiff's father and mother were witnesses for her. They had known defendant for many years. They do not sustain her as to his character in this respect. Defendant had lived in Dallas Center for twenty-five years; for ten years of this time his position in the bank brought him into daily contact with many people. These are not produced by plaintiff. A number of the neighbors, and his employers, testify that he was not of such disposition. There may have been times in their relations with each other when he was to some extent sullen and indifferent. There was some complaint by her in her letters to him in regard to these traits before the marriage. She also related an instance of temper by defendant before marriage, and for which the engagement was broken by her. The trial court seems not to have given this matter serious consideration as ground for granting the divorce, and we think it is not sustained by the evidence. Five witnesses, other than plaintiff and the witness as to the Cedar Rapids transaction, testified in her behalf;

two of these were her father and mother. Defendant had thirty-two witnesses.

About four and a half years after the parties were married, defendant obtained some pictures of the human form of nude women. Some of these were photographs. There were about a dozen of them, according to his story; she says there were more, but he says they were not all lewd. Plaintiff also testified that defendant has some improper printed stories. Defendant denies having some of those named by her. She testifies: ''He frequently wanted me to look at these pictures and read the stories, thinking it might probably have the effect on me he desired. For that reason, I read two or three of them to satisfy him, and often, if I came in suddenly, found him lying on the bed reading these stories, or perhaps he would hide them if he saw me coming. I told him they made me sick and really gave me a nauseating sensation.'' He testifies that he did not ask her to read them; that she read them without his asking. Plaintiff introduced an envelope in which she claims defendant received these pictures. The postmark on this envelope bears date December 21, 1910. Plaintiff testifies she came to Des Moines to take up her residence in October, 1910, and has made Des Moines her home ever since; so that from and after the times these pictures were received, the only time defendant could have an opportunity to show them to her would be the times she visited in Dallas Center. Defendant says they were destroyed by him when he found they were objectionable to her. It appears that plaintiff first brought a picture, of the kind described, into their home. Plaintiff's mother testified that in the home of these parties there was a picture of a nude woman in a bathroom that she objected to. Defendant says plaintiff brought it there, and she did not deny that such was the fact. In *Potter v. Potter*, 75 Iowa, 211, it is held that one party cannot be heard to complain of indecent epithets applied to her if she had previously used epithets of a similar nature in addressing the other party. The same rule should

apply here, as to the pictures. The sexual passion is well
developed in both of these parties. We judge this, as to plain-
tiff, from some of her letters to defendant, particularly, Ex-
hibits 10, 59, and some others. No reflection is intended by
this as to her character. They show her feeling for defendant
at the times the letters were written.

The next charge is a grave one. It is in regard to al-
leged practice by defendant of a secret vice. We see no reason
for believing that the testimony of one is entitled to greater
weight than the other. They each make charges against the
other in regard to this matter, which ought not to be men-
tioned, and the subject should be referred to in an opinion
as briefly and as delicately as possible. Defendant stoutly
denies the charge that he is guilty of such practice, though he
admits he did a few times when a boy, and that he told her so.
She claims to have seen but one such act. From its very
nature, it would be difficult to prove, and as difficult to rebut
by any other evidence than a denial. Plaintiff is not corrobo-
rated as to this, nor is either party corroborated as to the dif-
ferent charges they make against each other in this respect. As
stated, the charge is difficult to prove or disprove. However,
a witness for defendant testified: ''Mr. Hall roomed in our
house some two and a half years before he and Georgia went
to housekeeping. During that time I looked after his bed, ex-
cepting when Mr. Brenton's aunt was with us, when she did.
I found nothing to indicate uncleanliness, or anything that
would indicate the vice charged. I handled the bedding and
different clothing sufficient to observe it if it had been there.
His library was located in the room he occupied. I never
found any lewd pictures, or lewd or low-grade books in his
room or about his clothing.'' Plaintiff's father had not dis-
covered anything wrong in the married life of the parties until
the separation agreement. He testifies: ''The question was
raised about a notice being put in the Dallas Center paper in
regard to the contract of separation. My daughter had
already left him that week. I had never seen a thing to in-

dicate that there was anything unpleasant between these people. I saw Guy most every day at the bank; transacted business with him nearly every day. I saw my daughter practically every time she was in Dallas Center, perhaps not always daily, but I saw her frequently, and I had not thought of anything being wrong until the matter of this contract was told me.'' The charge is not established.

There is basis for the claim that defendant was jealous of the doctor, and perhaps, to some extent, of others; perhaps unreasonably so, in one instance at least. On her return from Colorado unexpectedly, defendant would not speak to her. He admits he was very angry at her at this time, and the reason for it seems to be that a short time before he had received an anonymous telephone communication that Dr. Parriott was in Colorado with the plaintiff. It appears that this was not the fact. Of course he should have had more faith in his wife than to have believed any improper conduct from such a source. He should have first advised himself whether or not it was true that the doctor was with her, instead of taking it for granted, and sulking. While we do not wholly excuse defendant for such conduct, there is some excuse for his feelings. We must take human nature as it is. Some of the circumstances bearing on this question are that, as stated, there was a long courtship; they were too intimate for each other's future welfare. We do not mean to say there was any actual wrong between them before marriage. If we were required to make a finding as to this, we should find that they were not guilty. Yet sexual matters were freely discussed by them before they were married. Much of this appears in her letters to him, and which are not disputed. Her father was fearful about it. In one of her letters to defendant, written about four months before the marriage, Exhibit 67, she refers to a conversation with her mother, and says: ''I am glad you have such restraint over yourself as you have. She said that feeling you have for me would never be completely satisfied until I satisfied you (or rather whomever *you wanted* satis-

fied you, and I guess that's *me*, isn't it?). She said we had done remarkably well in our courtship, for she felt sure we were both pure as when we started, and it displayed great control. She said that she felt positive that the reason papa had acted so towards us was that, knowing people's natures along those lines—he could not conceive of us being together as we had without doing something we should not, and when he thinks about it, he gets so morally certain that we *have* that he gets mad at us because he *thinks* we're guilty. So, knowing what I do now, I feel quite proud of our conduct and would not hesitate a moment on marrying you as regards your passion for me." She appears to be an attractive woman. The tendency of such intimacy would be to make one or the other somewhat suspicious, if attentions were shown, by others, and accepted. The extent of such a feeling would depend, to be sure, upon the disposition of the party.

Defendant says that two or three years after their marriage he noticed a change in his wife. About this time, a witness, apparently of the highest credit, and disinterested, testified that plaintiff told him she did not love her husband, and was going to leave him; that she had an affinity. This witness is one of the defendant's employers, and testified for defendant, but he seems to have been friendly with, and a confidant, of both. She called this witness up by telephone and requested him to call at her home for the purpose of discussing this matter at the time of such alleged conversation. Defendant testifies that when he noticed the change in his wife he talked to her about it, and that she stated that she loved Dr. Parriott, and that the doctor was in love with her. She denies these matters. Dr. Parriott treated her professionally, as did two or three other physicians. She told this doctor of her family troubles. He paid her some attentions in addition to his treatment of her professionally. Defendant testifies, and plaintiff admits, that defendant requested her to desist from her association with Dr. Parriott. Defendant does not claim they were guilty of adultery. Defendant's

feeling in the matter was known to plaintiff and to Dr. Parriott. Defendant had a dislike for the doctor, of long standing, which was known to plaintiff. As stated, there had been trouble between defendant and Dr. Parriott and their families some years before. Other circumstances might be stated. Under the circumstances, though defendant was at fault perhaps to some extent, yet plaintiff is not blameless. It was her duty to discontinue her relations with Dr. Parriott and endeavor to allay her husband's suspicions. As bearing on this point, see *McKee v. McKee,* 77 Iowa, 464; *Beckley v. Beckley,* 23 Or. 226 (31 Pac. 470).

The opinion of the trial court is printed in the record. From it, it appears that the judge was in grave doubt as to whether the evidence was sufficient to warrant a decree of divorce, and the decision seems to have been based largely on this question of jealousy and the treatment of plaintiff by defendant because of it. No physician was called to testify as to her health. She gives her opinion as to her physical condition. She says: ''I am suffering from nervous trouble at this time. My condition when I married him was not very good. I had been working hard. It was fatigue. This trouble has progressed, and I have been subject to very bad nervous headaches.'' She also makes a general statement that she is a nervous wreck. In our opinion, the evidence does not show that defendant was guilty of such cruelty as to endanger life. *Wells v. Wells,* 116 Iowa, 59; *Sylvester v. Sylvester,* 109 Iowa, 401; *Blair v. Blair,* 106 Iowa, 269; *Olson v. Olson,* 130 Iowa, 353.

In the last case it was said: ''A little patience, a spirit of forgiveness, and a measure of toleration for the frailties of human nature will do more for these parties than a decree of divorce. Incompatibility of temper is no ground for divorce; and, while we may not compel husband and wife to live together, we can at least make it so difficult to obtain a divorce as to encourage another effort at observance of the matrimonial vows.'' Such is the situation here. It is not

a mere matter of accommodation, or whether the courts will relieve the parties of a disagreeable situation. The public, as well as the parties, are interested in this matter. The sanctity of the marital relation is of the highest importance to the well-being of society. It ought not to be dissolved but for satisfactory reasons; upon some of the grounds provided by the statute, and then only when established by the evidence.

It is said the allowance for attorney's fees is excessive. Considering the record, the amount of alimony allowed, the amount of defendant's property and his ability to pay, we think the allowance is too large; but, because of the reversal on the merits, it is unnecessary to discuss that feature of the case.

The decree granting a divorce, alimony, and attorney's fees is therefore reversed. A decree may be entered in the district court, or in this court, at the election of defendant. —*Reversed.*

WEAVER, C. J., and LADD and EVANS, JJ., concur.