ANNA HILL, Appellant, v. JOHN E. HILL, Appellee.

**DIVORCE: Grounds—Cruelty Without Resulting Danger to Life.** Inhuman treatment without resulting danger to life is no ground for divorce.

**Headnote 1:** 19 C. J. p. 44.

*Appeal from Plymouth District Court.*—WILLIAM HUTCHINSON, Judge.

APRIL 6, 1926.

ACTION for separate support and maintenance, with cross-petition asking for divorce. On trial, the lower court dismissed plaintiff's petition, and granted a divorce on the cross-petition. Plaintiff appeals.—*Affirmed in part; reversed in part.*

*T. M. Zink* and *A. R. Molyneux,* for appellant.

*H. S. Martin* and *Roseberry & Roseberry,* for appellee.

ALBERT, J.—The appellee's cross-petition sought divorce on the grounds of cruel and inhuman treatment such as to endanger his life. The legislature, in its wisdom, has seen fit to provide grounds or causes for divorce. Such grounds are specified in Section 10475, Code of 1924. Among them is the following:

"When he is guilty of such inhuman treatment as to endanger the life of his wife."

Section 10477 authorizes a divorce in favor of the husband on the grounds specified in the aforesaid Section 10475. It must be confessed that, in some of our cases, because of the loose use of language therein, there is an apparent confusion in the construction of this section; in some others, the requirements of the section that the inhuman treatment be of such

character as to endanger the life of the spouse has not been given its full force and effect.

In the early cases touching this question the real interpretation of this statute seems to be clearly pronounced. In the case of *Beebe v. Beebe*, 10 Iowa 133, the court said:

"In the case of cruelty, under our statute, the treatment received is not of itself a cause of divorce, and becomes material only as showing a just foundation for the apprehended danger to life. And this cause of divorce is founded on the well recognized law of nature that the duty of self-preservation takes precedence, and that the duties of this relation are not required to be performed in a state of personal danger."

In the case of *Caruthers v. Caruthers*, 13 Iowa 266, we said:

"The material inquiry is * * * whether the life of the complainant is endangered, or will be, by the continuance of the cohabitation."

In *Knight v. Knight*, 31 Iowa 451, at 456, we said:

"The cruelty justifying a divorce is defined to be such conduct in one of the married parties as renders further cohabitation dangerous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm as materially to interfere with marital duty. * * * Courts are admonished, in view of the rapidly increasing tendency to divorces in the present day, and the corresponding weakening of the marital tie, fraught with the most dangerous consequences to social order, that divorces should not be decreed except for 'grave and weighty causes.' Society has an interest in the permanency and stability of the marriage relation; and as individuals, in entering into the social compact, have been required to yield many personal rights for the general good, so many married couples, for the good of their common offspring, the conservation of social order, and the maintenance of general morality, must bear with patience and composure the occasional disquietudes growing out of inharmonious tempers and dispositions. 'Mere turbulence of temper, petulance of manner, infirmity of body or mind, are not numbered among these (grave and weighty) causes. When they occur, their effects are to be subdued by management, if possible, or submitted to with patience; for the engagement was to take for better, for worse;

and painful as the performance of this duty may be, painful as it certainly is in many instances which exhibit a great deal of the misery that clouds human life, it must be attempted to be sweetened by the consciousness of its being a duty, and a duty of the very first class of importance. And it is not every slight touching of the wife by the husband, even in anger, which will justify a divorce.' ''

To the same effect is *Vanduzer v. Vanduzer*, 70 Iowa 614.

In *Schichtl v. Schichtl*, 88 Iowa 210, it is said:

''The plaintiff has been peevish, quarrelsome, and needlessly meddlesome in her husband's business and other affairs, and in a way to discourage, rather than encourage, prosperity or domestic happiness. The details of her course in this respect constitute the grounds of his complaint and claim for divorce in the cross-bill, and they have, beyond question, been a strong provocation to many of the acts of which she complains, but they do not amount to a justification.''

In *Hall v. Hall*, 162 Iowa 653, at 661, we said:

''It is not a mere matter of accommodation, or whether the courts will relieve the parties of a disagreeable situation. The public, as well as the parties, are interested in this matter. The sanctity of the marital relation is of the highest importance to the well-being of society. It ought not to be dissolved but for satisfactory reasons,—upon some of the grounds provided by the statute,—and then only when established by the evidence.''

To the same effect is *Pfannebecker v. Pfannebecker*, 133 Iowa 425.

These expressions from our former opinions are wholly in line with the wording of this statute. In other words, the primary question for determination is whether or not the life of the spouse is in danger. If not, the character of the treatment, however despicable, is not a ground for divorce. It is not the intention of our statute that a decree of divorce shall be granted for the mere asking. The strength of our social structure depends largely on the permanency and stability of the marital relation. The home is the unit of our civilization, and should not be disrupted for a transient or trivial reason. The marriage tie should not be severed to meet the fleeting fancy or whim of

either party, but only as a last resort, when the protection and preservation of the life of the injured spouse demand it.

We have ever been committed to the rule that incompatibility of temper is not a ground for divorce. *Sylvester v. Sylvester,* 109 Iowa 401; *Yetley v. Yetley,* 196 Iowa 314; *Meyer v. Meyer,* 169 Iowa 204; *Olson v. Olson,* 130 Iowa 353. In the latter case we said:

"Incompatibility of temper is no ground for divorce; and, while we may not compel husband and wife to live together, we can at least make it so difficult to obtain a divorce as to encourage another effort at observance of the matrimonial vows."

In determining this question, of course it is proper to take into consideration the disposition and temperament of the parties, their health and mental ability, their knowledge and experience in the world, their standing and position in the community, the degree of comfort and refinement which may reasonably be expected in their home life, and their previous training and education. *Thompson v. Thompson,* 186 Iowa 1066; 19 Corpus Juris 53, Section 97. It is apparent, therefore, that, under this section of the statute, in order to warrant a divorce two things are necessary: First, a proof that the accused party is guilty of inhuman treatment; second, that such inhuman treatment is of such character as to endanger the life of the spouse. A failure of proof in either of these matters would require the court to refuse the prayer of the appellee. With these primary rules settled, we turn now to the evidence in this case.

It would be useless for us to set out the testimony. The abstract and amendments consist of some 450 pages, and we can do no more than to briefly summarize the same. It may first be said that it appears that the past life of this family has been combed with a fine-tooth comb. Many instances in the family life which should have been long since forgotten have been resurrected, redecorated, colored, and magnified far beyond their importance. We have no evidence on the early history of these people, their education or station in life, or their acquaintance, knowledge, or appreciation of the civilization in which they lived.

It appears that, sometime in 1902, the appellee, J. E. Hill,

then a young man of about 18 years of age, resided on a farm near Cherokee. He eloped with a young woman who lived in his neighborhood. They went to Dakota City, Nebraska, where each swore to a forged consent of their parents to their marriage. They were there married, and returned to Cherokee the same day. On their advising their parents of what had occurred, proceedings were promptly brought, which resulted in annulment of the marriage. Much is claimed for this circumstance, but, as we view it, it has little weight in the consideration of this case.

On the 24th of August, 1903, the appellee, Hill, married this appellant, who had been a former flame of his. She was acquainted with the circumstances of his elopement, as above related, at the time of her marriage. They lived with his parents for 3 or 4 months after their marriage, and then moved across the road and lived with his grandmother. He then had a call to the ministry of the Methodist Church, and his first charge was at Curlew, Iowa. From there the couple went to Morningside, where appellee entered the college for a term of 3 months. Then they moved to Aurelia, Iowa, where they lived about a year. During this time, appellee was not engaged in the ministry. Following this, he worked for the father of appellant on a tract of land owned by the father. From Aurelia they moved back to the home of appellee's grandmother, and he helped his father on the farm. He then secured a charge as minister at Swalevale, Iowa, where he lived for over two years. From there they went to Dolliver, Iowa, where he had charge of two churches; then to Salix, Iowa, where they lived for nearly three years. They lived in a parsonage, and had charge of two churches, one at Salix and one at Luton. While living at Salix, appellee had a nervous breakdown, but physicians testify that he had no organic trouble. Shortly after that, he enlisted in the "Y" service, and went to France. He was in such service from April, 1918, to May, 1919. Shortly after his return home, he moved his family to Merrill, Iowa, where he had charge of a Methodist church up to the time of this litigation.

It is apparent from the record that these people, in the early years of their married life, suffered the pinch and inconvenience of poverty; and the wife naturally rebelled against

these conditions. There were born to them two daughters, who, at the time of the trial in the district court, were, respectively, 19 and 16 years of age. Many circumstances are related of the differences between these parties in their early married life, and prior to the time appellee went to France. · In the usual grind of their condition, the wife, on various occasions, made inexcusable remarks and statements to her husband, and undoubtedly said things to him which she should not have said, and made accusations against him which the facts did not warrant. He seems to have had two fainting spells while at Salix, before he went to France, but he fully recovered therefrom. He was a man given to athletics, hunting and boxing, and enjoyed outdoor life. While it is now sought to correlate all these differences between husband and wife during those years, and use them as cause for the fainting spells from which appellee suffered at Salix, we think this is largely colored. But, be that as it may, we do not feel that these differences did or would in any way endanger his life; and we do not feel that his affection and love for his wife and family were disturbed at the time he left for France.

There are set out in the record approximately 85 letters which appellee wrote appellant from the time he left home to go to France until he returned therefrom. We have read these letters with care. They are letters of a character that any man under similar circumstances would write to his wife and family if he held them in such respect and reverence as a family man should. Either these letters express the actual feeling of this man's heart and his affection towards his family, or he is a consummate knave, to write such letters. We give him credit for writing them in good faith, and are satisfied from them that, at that time, whatever differences may have come between husband and wife prior thereto had been forgiven and forgotten, as they should have been.

As said, on his return from his service abroad, appellee again took up his duties in the ministry. He claims that, after his return to the ministry, his wife again called him harsh names, and irritated and aggravated him by her statements and conduct. We do not set these matters out in detail, but it is to be said from the evidence that some of the complaints the

wife made were based on the conduct and acts of the appellee. Other statements and accusations made by her were without foundation, and inexcusable. One of the parishioners of the appellee was a woman by the name of Lillian Stinton, a prepossessing widow, with a fair abundance of the world's goods, who kept her automobile in the garage at the parsonage. Some difficulties arose between the appellee and his wife about appellee's efforts in repairing or assisting in the repair of this automobile. Suffice it to say that, on the 8th day of June, 1924, the differences between these parties came to a head. The wife, who was quick-tempered, was angry, and said things to appellee which were wholly unwarranted. This resulted, on the same day, in the wife's stating to the husband that he would have "to use her different, or she was going home." He said:

"The die is cast, and I want you to understand that I am through; you have cursed me for the last time, and you have lied to me for the last time, and you have deceived me for the last time. I am through with you,—either you go or I go."

He stated to her that she could have the furniture, and that he would give her $100, and that, if she wanted to get a divorce, he would not appear against her; that, if she did not get one, he would. He paid her $25, and agreed to pay her the balance of the $100 later. She took their two children and went to her father's home at Cherokee. Mrs. Stinton, who appeared on the scene at this time, was called upon by the husband to witness the fact that he had given his wife the $25 check, as per agreement. Shortly after this, the appellant herein instituted proceedings in the district court against Mrs. Stinton, asking damages for the alienation of her husband's affections. In due time that case was tried, resulting in a verdict in favor of Mrs. Stinton. The case at bar had at that time been instituted by appellant. There was no claim in the case that there were any illicit relations between appellee and Mrs. Stinton, and it is not so claimed in this proceeding. All that was then claimed or is now claimed is that the appellant lost the consortium of her husband. Such, briefly stated, is the history of this case.

We have given to this record added study, because of the importance of it to the parties. We feel that the appellee, on his cross-petition, did not carry the burden of proof that the

law places on him. We have doubts whether, under the record, it can be said that the treatment of and conduct toward appellee amounted to inhuman treatment. But, be that as it may, we are abundantly satisfied that there is no evidence whatever to warrant a finding that the acts and conduct on the part of Anna Hill in any way endangered the life of J. E. Hill. It necessarily follows, therefore, that the ruling of the district court in granting to J. E. Hill a divorce was erroneous.

On the other hand, we are equally well satisfied that the district court was right in its ruling dismissing the appellant's petition for separate support and maintenance. The action of the district court in dismissing appellant's petition is affirmed. Its action in granting appellee a divorce on his cross-petition is reversed.—*Affirmed in part; reversed in part.*

DE GRAFF, C. J., and STEVENS, FAVILLE, and MORLING, JJ., concur.