Lucille Ross, Appellant, v. Russell O. Ross et al., Appellees.

November 15, 1927.

Rehearing Denied February 17, 1928.

*Chester J. Eller*, for appellant.

*A. L. Yeaton* and *C. S. Cooter*, for appellees.

Albert, J.—Just how these two actions can be joined, we do not quite understand; but, as no objection is made thereto, we proceed to treat the two cases submitted.

Lucille Ross and Russell O. Ross were married on July 3, 1922. As a result of such marriage, one child was born, a boy, whose age was about seven months at the time the petition herein was filed. The claim of the plaintiff is that defendant was guilty of such cruel and inhuman treatment as to endanger her life; and in his cross-petition he claims that plaintiff's behavior and conduct were such as to endanger his health,—that plaintiff was possessed of an uncontrollable temper, and was guilty of using vile language; and he asks that he have a divorce and the custody of the child.

As is usual in such cases, the matter involved in this part of the case resolves itself only into a fact question. The law governing actions of this kind is too well settled to demand extended citation of our cases on the propositions involved. We have stated that it is not sufficient ground for granting a divorce that the defendant has been guilty of cruel and inhuman treatment, but the evidence must go further, and show that it was such as would endanger the life of the complaining spouse. This question was quite fully reviewed in *Hill v. Hill*, 201 Iowa 864.

It is provided by statute, Section 10474, Code of 1924, that no divorce shall be granted on the testimony of the plaintiff alone. In other words, the plaintiff's testimony must be corroborated. No good could be accomplished by setting out in full the marital difficulties of these parties. What is set out is simply a summary of the testimony and our conclusions in relation thereto.

These parties were students at the agricultural college at Ames in 1920, defendant taking an engineering, and plaintiff a domestic science, course. Their courtship ran the usual course, until defendant graduated, in the spring of 1922. In the intermediate time, she had visited at his home in Akron, Iowa.

They started housekeeping on the property involved in this litigation. He had employment at the time, and earned about $100 a month. His father furnished him about $1,100, to furnish the house in question. The echoes of the marriage vows had scarcely ceased before the family troubles of these parties began. She testified that he was guilty of indifference, had no love for her, and treated her more as a servant in the house than as a spouse; that he neglected her, and was lazy, and would not work, and finally lost his job; that he refused to accompany her to places she desired to go; that he became involved in indebtedness for family necessities, and after he lost his position in Des Moines, he went to Akron, the home of his parents, stating that he would be back in a short time; that he constantly nagged at her, and nothing she did ever pleased him; that he showed no affection or kindness toward her; that, at the time of her accouchement in the hospital, he did not come to see her until requested; that he showed no affection or sympathy for her under the circumstances, and all he did was scold about the expense;

that she was in the hospital about two weeks, and was then taken to her father's home, and was ill and under the doctor's care for a long time thereafter; that her husband paid no attention to her, except at one time, when he was notified of her condition and came down to see her, stayed a few days, and went back; that he wrote to her, saying that she was a burden, and discharged her nurse because he stated he could not pay her. The correspondence between them up to this time seems to have been casual, and about every two weeks, letters passed back and forth. She testified that, when he came and called upon her on this occasion, he did not inquire how she was, or sympathize with her in any way; that he came down in the fall, and stated that he was going to rent the house and sell some of the furniture to pay his bills; that he did not pay any bills, however, but went back to Akron, and never wrote to her after September, 1925; that she was then living with her parents; that she took part of the furniture out of the house, leaving the rest there for a tenant; that this tenant stayed only about three months, and she rented the house thereafter, and collected the rent. One incident in their early married life when she says he slapped her is corroborated, and one other witness who visited them in 1923 testifies that the husband kept "teasing and tormenting his wife, and kept her on edge and nervous all the time." There is nothing in the record to show that, since the illness above referred to, her health has been other than good. Her father testifies that he was a frequent visitor at her home, and that the husband found fault with her and they quarreled about everything. He further says that, during the time, Russell did not support her in the manner that she was used to being supported; that he bought her clothes and furnished her money all the time she was married. Later, the defendant, his father, and plaintiff's father had a meeting at an attorney's office in Des Moines, relative to this situation. Defendant's father agreed to guarantee to plaintiff $35 a month for a year. Defendant sent her money, from time to time, which was used to pay hospital bills and other expenses, and she had only about $140 for her own use. On the other hand, defendant's testimony tends to show that the relations between husband and wife were not amicable, to say the least. According to defendant's evidence, the first serious trouble was when they went to purchase furniture. He

claimed that plaintiff wanted to buy the most expensive furniture she could get, and spend the $800 which his father had given him for three or four pieces of furniture. He says:

"I don't know the real trouble between my wife and I. We just didn't get along. She seemed to have a very irritable and nervous disposition, and I couldn't reason with her or talk with her. She spent most of the time crying and fretting, and then had long spells when she wouldn't say a word to me. She was profane and abusive toward me, and called me vile names. Her pet name for me was 'son of a bitch,' which she emphasized occasionally with swear words."

He says that, after he picked her up and carried her out of the house, she promised to quit using that word; that she wrote letters to him at Akron, using vile language. He admits that he slapped her once, but says that she struck first; that it was just a little friendly quarrel. It could not have been of very much moment, because both parties say that afterwards they went to a picture show together. He says there were never any other acts of physical violence on his part. On one occasion, when they were out of coal, he advised her that he was going to get a load that day, and she answered, "By God, there will be no coal brought into this house now;" and when he told her the water pipes would freeze, she said, "Let them freeze." She threw a teakettle of hot water on the floor, and grabbed him, and as she pulled away, she tore the pockets off his coat. He says that, when his wife was sick, and he was called to Des Moines, he and his brother drove all night to reach the city, and when he went in to see his wife, the nurse was out of the room, and the principal thing she said to him was: "You son of a b—, go back to Akron, and take your brother with you. We don't need you down here at all." He says that he took his brother and went home. He says that during his married life he worked all of the time he could get work, and when he was working in Des Moines, he did not get through work until 6 o'clock; and that he played golf, three or four different times, against his wife's protest, and on one occasion, when he went out to play golf with his brother on Sunday, when he got home she said, "God damn you, why don't you stay around home, instead of going out to play golf on Sunday;" that, when he complained about her not waiting for him when he was late to his meals, and said he

didn't like cold food, she said he could eat down town, and swore about it, and threw a butcher knife at him. He testified that she was crying and mad; that she was that way most of the time; that one Sunday, when he had gone out to play golf, and got back about 12 o'clock, she did not want to get any dinner; said that, if he could go out and play golf, she would be damned if she would work, and she didn't get him any dinner; that he then walked down to the river, and when he came back, she was lying undressed on the kitchen floor, with all of the gas burners turned on; that, after he quit work for the Superior Fixture Company of Des Moines, he took up insurance, and one night when he was studying, she wanted to go to bed about 8 o'clock; that they never slept in the same room, and she went to her room and went to bed; that, when he went up later, he smelled gas, and went down to the kitchen, and she was again lying on the floor, with all of the gas burners turned on. He said:

"I told her if she wanted to commit suicide there was no need of blowing up the house."

He says that she never wanted to go the same places he did, and the only way he could get to go where he wanted to was to suggest going some place else. On some of the incidents that he relates he is corroborated.

This is by no means all of the testimony, but some of the high lights therein. Suffice it to say that each, as a witness, denies everything that the other testified to that would militate against the one giving the testimony.

The second part of this case involves the claim, indefinite in some respects, growing out of the following facts: Before this marriage occurred, the defendant's father, Robert Ross, came to Des Moines and bought a lot, taking the title in his own name, and built a house thereon, into which, after its completion, this newly wedded couple moved, and lived during all of the time they lived together. It is the claim of the plaintiff that, before her marriage, she insisted that she would not be married until they had a home, and that defendant's father promised her that he would give them such home; that, in pursuance thereof, defendant's father bought this lot and built the house thereon for them. She asks that title be quieted in her, on the theory that it was this promise which induced her to enter into the marriage relation; and if not, that it was a gift to her and her

husband; and if not, that she should have a life estate therein. Defendant's father intervenes in the action, and asks that title to the property be quieted in him, as the owner thereof,—thus the issue so raised on this phase of the case.

Defendant's father testified that he never made any such promise at any time to the plaintiff; that he and his son talked this matter over, and he told him he would buy a property or furnish him a property in Des Moines in which he could live without paying rent until he "got on his feet;" and that, in pursuance of this understanding between him and the boy, he purchased the lot and built the house thereon and allowed them to live therein. Russell Ross, defendant herein, corroborated his father in this respect. The lot was purchased at a cost of about $2,300, and the house cost about $5,500. Plaintiff testifies that this promise was made at Akron, when she was there on a visit, in the presence of the other members of the Robert Ross family; but the other members of the family uniformly deny that they ever heard such conversation. The question of the statute of frauds is quite fully discussed in relation to this matter, but in the view we take of the case, it is not necessary to discuss that question.

Taking all of the testimony in the case in relation to this transaction, we are disposed to believe that the weight of testimony is with Robert Ross. The district court so found, and we are not disposed to disturb its findings thereon.

The district court also found that plaintiff was not entitled to a divorce, under the showing made in the case, nor was the defendant entitled to a divorce on his cross-petition. We are not inclined to disturb this finding. People must learn that the marriage relation is not a gala-day celebration, that they may end at any time they see fit, by the simple asking of the court for a divorce. The theory that some people have that this is the day of free and easy divorces must be discouraged. The evidence in this case on the part of the plaintiff and on the part of the defendant on his cross-petition does not measure up to the requirements of the statute. Therefore, the ruling of the district court was in all respects correct.—*Affirmed.*

EVANS, C. J., and DE GRAFF, MORLING, and WAGNER, JJ., concur.