SARAH T. ROWE, *Appellee*, v. FRANK S. ROWE, *Appellant*.

No. 17,021.

SYLLABUS BY THE COURT.

1. DIVORCE — *Extreme Cruelty — What Constitutes.* Extreme cruelty exists when the conduct of the husband or wife is such that the life or health of the other may be endangered, or when such conduct unjustifiably wounds the mental feelings or so destroys the peace of mind as seriously to impair the health or endanger the life of the other, or is such as utterly destroys the legitimate objects and aims of matrimony; and when words alone are relied on it must appear that they were uttered not merely as complaints against the real or apparent misconduct of the other, but that they were uttered without justifiable cause and for the purpose of inflicting pain.

2. ———. *Extreme Cruelty—What Does Not Constitute.* Occasional irritability, faultfinding and outbursts of temper on the part of one, followed by demonstrative affection and by forbearance, with a sincere desire for the love and companionship of the other, do not constitute extreme cruelty.

Appeal from Allen district court.   Opinion filed May 6, 1911.   Reversed.

*R. H. Bennett,* and *R. E. Cullison,* for the appellant.

*H. A. Ewing, S. A. Gard,* and *G. R. Gard,* for the appellee.

The opinion of the court was delivered by

WEST, J.:   The parties hereto became acquainted at Pike's Peak in October, 1899.   They were married at Iola, Kan., October 5, 1904.   The plaintiff was then about twenty-seven years of age, in fair health, and well educated.   Her mother was a well-to-do widow, advanced in years, to whom she was greatly attached —her affection being fully reciprocated.   The defendant lived at Baltimore, Md., where he was a railroad ticket agent, and there the couple went to live.   Though earning but a small salary the defendant when married was worth from $10,000 to $12,000, and is an energetic and successful business man, being at the time of the trial worth from $18,000 to $20,000.   The parties lived at Baltimore—plaintiff's mother living with them for some time—until June 21, 1907, when the wife came to Iola where this action was begun, November 17, 1908.   The court granted her a decree on the ground of extreme cruelty, and also awarded her alimony.

The defendant attacks the findings as beyond and unsupported by the evidence and insists that extreme cruelty was not shown, and therefore the decree was unwarranted.   The court made forty findings of fact and we have carefully examined them as well as the evidence found in more than 100 pages of the abstract. The most serious findings are to the effect that upon the wedding trip the defendant manifested petulance and irritability, causing plaintiff distress of mind; that at the St. Louis exposition grounds the failure of some relatives to arrive at a certain time "greatly enraged

defendant and by his temperament and demeanor and faultfinding had a tendency to greatly humiliate the plaintiff and destroy her happiness"; that on two different occasions he applied to her the opprobrious epithet of being a "kept woman"; that on several occasions he threatened to abandon her and once threatened to blow up the house, which so frightened her that she fled and sought shelter at the home of her mother-in-law; that plaintiff's right lung becoming affected, he opposed her consulting a physician, intimating that she wanted to spend his hard-earned money needlessly; that early in 1907 he would upbraid her for keeping him awake at night by her coughing, but refused to permit her to take another room when she expressed a desire to do so; "that on one occasion . . . the plaintiff, in order to avoid the faultfinding by defendant by reason of her coughing during the night, went to her mother's room to remain there during the night and thus have rest for herself and not annoy defendant by her coughing; this greatly enraged defendant and he entered the room of plaintiff's mother, where both the mother and the plaintiff had retired, and violently seized plaintiff and forcibly endeavored to carry her from the room"; that on or about the 21st day of June, 1907, plaintiff, being in a very enfeebled condition and believing herself without sufficient medical attention, and because of the defendant's gross insults and ill treatment, was compelled to leave him, and returned to her mother at Iola; and that since that time he has wholly neglected and refused to provide for her.

The petition alleged that plaintiff's health became impaired and her right lung affected as the result, as she believed, of defendant's "constant indignities and oppression"; that at times he abused her outrageously by speaking to her harshly in a manner that would annoy and aggravate her and hurt her feelings; that in "one of his fits of abuse" he called her a "kept woman"; that upon several occasions he laid violent hands upon her;

Rowe v. Rowe.

that he treated her like a slave instead of a wife by re-requiring her to meet him at the door on his return from the office and expecting her to relieve him of whatever he might be carrying, saying once in her presence, speaking of her: "I bought her and paid for her"; that by reason of his gross insults, ill treatment, complaints and neglect "she was compelled to leave the defendant and return to her old home in Iola on or about the 21st day of June, 1907." Various other charges were embraced in the first cause of action, and the second alleged an abandonment of plaintiff by defendant on June 21, 1907, of which no proof whatever was offered. The 37th finding is as follows:

"I further find that all and singular the several matters and things in plaintiff's petition averred of and concerning defendant are and were at the commencement of this suit true."

Aside from this there is no finding or evidence of any assault unless it be on the occasion when plaintiff went to her mother's room. The findings as well as the evidence disclose a number of petty and trivial matters too insignificant to deserve notice or to require attention. As to the matters of seeming importance covered by the findings the evidence shows that the irritability at the St. Louis exposition was scarcely worthy of mention. The "kept woman" matter was simply and only this: The defendant desired a child, but plaintiff did not and asserted that should she have one it would be as ugly as defendant's stone tobacco jar. He then referred to a remark once made to him by a chum that being married and having no children was too much like having a kept woman. There is no dispute that this remark of the chum was repeated and received in perfect good humor, though plaintiff testified that once afterward she referred to it and he said, "Yes you are," to which she replied that he should not expect a kept woman to make a home and be a wife. The plaintiff did not testify to a single threat of

abandonment, unless a threat to "leave the house" could be tortured into such a thing. The testimony shows that defendant had her consult different physicians, but that they did not find evidences of tuberculosis earlier than May, 1907, and there is no question that he provided for her liberally and maintained her in ease in a well-appointed house.

The bedroom episode is explained by the defendant in this wise: His wife had been sleeping with her mother who objected to the daughter sleeping with the husband, and finally plaintiff voluntarily told him she would sleep with him that night. They went to their room and disrobed, when plaintiff went down to bid her mother good night. After waiting for her to return until half past eleven, the defendant went down and rapped on the door and asked her to come, and the mother said: "Hold yourself and don't you do it." Upon requesting a talk with his wife, who bade him open the door, he entered the room, when the wife arose, whereupon the mother rose in bed and said: "She will never leave this room this night."

"I put my arm around my wife. At that moment her mother jumped out of bed and said she was going to call a police out of the front window, and Mrs. Rowe said to me, 'Frank, you had better go on to bed and let me stay here all night.' I said, 'If you positively will, all right, but you promised me you were coming up,' and at this juncture Mrs. —— got into a perfect rage. She said all manner of things against me. My wife burst out crying and screaming to an extent that the doorbell rang from the neighbors around. It was a summer evening—I can not just recall the date at this minute—and her mother threw herself on the floor as if she had fainted or something. In the meantime Mrs. Rowe was in my arms. Mrs. Rowe said, 'Frank, run and get a doctor quick, mamma is dying.' I, in my bare feet, with my gown on, rushed across the street to Doctor Miller's and Dr. Miller was not at home. I came back and Sarah was at the head of the steps and she said, 'Frank, did you get a doctor?' I said, 'No, the doctor is not at home.' She said, 'Phone Dr. Pierce

Kintzing.' I phoned for Dr. Kintzing. Dr. Kintzing came himself instanter. Mrs. Rowe at that time had recovered herself and the doctor examined Mrs. ——— and found her in a perfectly normal condition except temper. She asked the doctor whether she should take his medicine. She said, 'You are a friend of Mr. Rowe and I believe it is poison.' He said, 'Madam, I am a professional man and I am here professionally.' The doctor asked Mrs. Rowe if there was anything wrong with her mother, and she said 'No.' She said, 'Frank, let us go in this middle room and sleep there to-night.' I said, 'No, I will go to my room and you stay with your mother.' If that occasion Mrs. Rowe calls cruelty I deny it. It was the love of a husband to a wife and it was to carry her own wishes and desires that night too. Other acts of mine were absolutely on the basis of love and kindness to her, the same as this one was."

The correctness of this version is in some respects corroborated by the wife and mother in their testimony and in others by many facts and circumstances otherwise shown.

The physician of the family, a neighbor woman and several girls who had been servants testified to the defendant's kindness and apparent affection for his wife, one of the latter saying that he had no temper but needed some. Grace Robinson testified concerning one incident as follows:

"Ques. What took place then? Ans. Her mother came down in the dining room. She said, 'Sarah, didn't you promise me you were going to leave Frank?' Mrs. Rowe says, 'Well, mother, I am not going to break my home up,' and then the old lady commenced to cry and went upstairs and had us to fan her, and a whole lot of stuff like that."

It appears that once he did, in a fit of anger, say he would blow up the house, but he immediately cooled down and returned to his work, and from plaintiff's description of him and his manner we can not believe she was greatly intimidated. His letters to her after her coming to Iola breathe a spirit of affection and

sincere desire for her return, while hers repeatedly
advise him of her determination to continue the separa-
tion.   The plaintiff's own testimony shows that she
prepared to go and took down pictures and arranged
matters for some time before leaving on June 21, 1907.
On the day she left she invited her husband to her room
while she was dressing and there extended to him the
extreme courtesies of a wife.   At the depot she kissed
him good-bye with tears in her eyes, and afterward
wrote repeatedly, addressing him as "My dear Frank"
and "My dear husband."   A note without address was
found in her room indicating in a way her determina-
tion to separate from him, but he had provided her
with round-trip transportation, which she accepted.
The plaintiff's mother, who had returned to Iola, wrote
to plaintiff on March 12, 1907, referring to her Balti-
more associations:   "It only proves that 'water will
seek its level and rise as high as its source,' and you
could no more be kept down in that false society than
I could. . . . I am surprised that you would go to
Harlan's and take Rowe for they are in touch with Iola
people."   On May 25, 1909, she wrote to plaintiff, "Oh,
you do not know how I despise Baltimore and every-
thing there. . . . Oh, what a nightmare my so-
journ there was."   At one time she wrote her daughter
that if she was not going to come she would disin-
herit her——adding "you know it would be an easy mat-
ter to get a divorce out here in Kansas, if you lived
here, and I would suggest that you call on Mr. ———
and consult him as your lawyer to know if what I
state is not correct."

From certain suggestions found in the briefs of
both sides we infer that even the extended abstract
fails to embody the substance of all the evidence.
However, from the abstract and the findings we have
a somewhat graphic picture of the condition of things
in the Rowe household.   Does the condition thus pre-
sented bring the defendant's conduct within the rule of

Rowe v. Rowe.

extreme cruelty?   This court has been more liberal in the construction and application of this rule than many others, and while there is no disposition to recede therefrom there is no inclination to extend its liberality. The leading decisions are *Gibbs v. Gibbs,* 18 Kan. 419; *Carpenter v. Carpenter,* 30 Kan. 713; *Avery v. Avery,* 33 Kan. 1; and *Masterman v. Masterman,* 58 Kan. 748.

The result of these may be thus formulated:   Extreme cruelty exists when the conduct of the husband or wife is such that the life or health of the other may be endangered, or when such conduct unjustifiably wounds the mental feelings of the other or so destroys the peace of mind as seriously to impair the health or endanger the life of the other, or is such as utterly destroys the legitimate objects and aims of matrimony; and where words alone are relied on it must appear that they were uttered not merely as complaints against the misconduct of the other, real or apparent, but that they were uttered without justifiable cause and for the purpose of inflicting pain.

The facts shown in *Gibbs v. Gibbs,* supra, *Carpenter v. Carpenter,* supra, and *Avery v. Avery,* supra, are far more condemnatory than here.   In *Masterman v. Masterman,* supra, the wife made repeated and specific charges against her husband of illicit relations with other women, not only to him, but to many women with whom she associated, the husband being a physician; and there were at least some grounds for her suspicion, shown by the  husband's conduct, but the judgment granting a divorce was reversed.   It was there said:

"In the home, love must be the law, and mutual concessions remove all occasions for controversy.   The interference of courts can never be invoked beneficially to settle differences in the family.   It comes only as a last resort, to separate those who fail or refuse to make home what is should be."   (58 Kan. 757.)

Here, the parties were of mature years, they had abundant time to become well acquainted before marriage, and while, like many others, they had differences, these, sometime before the separation, were all adjusted, and there is slight evidence or claim of misconduct thereafter. Had these twain been permitted to be one flesh, it is reasonably apparent that they would not have separated.

The marriage relation is too vital and important to be lightly dissolved. We must not suffer ourselves to be misled by sympathy or by a superabundance of allegation followed by a paucity of proof. While the defendant is shown to have a disposition and temperament unenviable in certain respects, the same may be said to some extent of the plaintiff. But we can find no satisfactory proof of any ill treatment on the part of the husband for the purpose of inflicting pain; on the other hand, his occasional irritability and ebullitions of temper appear to have been concomitant with, or followed by, demonstrative affection, patient forbearance and tender regard, with a deep desire for the love and companionship of his wife. Had she been free and so disposed we have no doubt whatever that she could have kept him constantly "wound round her finger." While she was not strong, and her cough finally developed into tuberculosis, we can find no just ground for holding that her husband was regardless of her health or the cause of its impairment. Being of a nervous, emotional temperament, and being presistently influenced against her husband, the plaintiff, after repeated assertions of her intention and desire to live with him, and after a full reconciliation of all past differences, was finally persuaded to leave him. Having done this, in attempting to secure the seal of the law to the separation, she appears to have recalled and remembered only the flecks of cloud in the sky of her marital experience and to have become so embit-

tered that no good thing concerning her husband could be kept in her memory. This condition of mind, sad as it is, will not justify a divorce unless the husband has by his words and conduct brought about such condition; for equally pathetic is it for him to see his life dream fade away and the wife he loved passionately become his accuser, and that not of her own free will.

We are impelled to the opinion that extreme cruelty was not shown, and the decree is therefore reversed.