No. 33,613

RYLAND C. PETTY, *Appellee*, v. LILLIAN B. PETTY, *Appellant*.

(76 P. 2d 850)

Opinion filed March 5, 1938.

*John Hamilton Wilson*, of Salina, for the appellant; *Lillian B. Petty*, of Salina, *pro se*.

*C. W. Burch, B. I. Litowich, LaRue Royce, E. S. Hampton, L. E. Clevenger* and *R. E. Haggart*, all of Salina, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: In September, 1936, plaintiff filed this action for divorce. He alleged the parties were married in January, 1924; that two children had been born to them, and charged defendant with extreme cruelty, gross neglect of duty, and abandonment for three years. The prayer was for divorce and that the court make such an order for the care and custody of the children as would be deemed proper. The defendant answered, admitting the marriage and the birth of the children, but denied the charges against her, and by cross petition sought a divorce from plaintiff on the grounds of extreme cruelty and gross neglect of duty. She asked for the custody of the children, and that the court approve a separation agreement entered into between the parties in 1933. The abstracts do not show

an answer to this cross petition. The action was tried in May, 1937, and the decision rendered in June, at which time the court made the following findings of fact and conclusions of law:

### "FINDINGS OF FACT

"1. The plaintiff is a citizen and resident of the city of Salina, Saline county, Kansas, and has been for more than one year last past before the filing of his petition in this case.

"2. The plaintiff and defendant were married at Tulsa, Okla., January 12, 1924. Two children, Denoya Petty, aged eleven years, and Marcheta Petty, aged ten years, are the children and the only children born of said marriage.

"3. The plaintiff at all times since the birth of said children has endeavored to maintain a home for the sake of said children.

"4. Defendant has the custody of both children at this time and has had at all times since 1933, and the court finds that she is a competent and capable mother and a fit and proper person to have custody of said children.

"5. Defendant has been and is now enrolled as a student in Chicago University for the purpose of qualifying herself as a psychiatric social worker, and it will take one more year at the Chicago University to complete her course. After defendant has completed the course which she is now taking in Chicago University she will be able to earn approximately $100 a month.

"6. The plaintiff is employed and earns the sum of $200 per month as salary and receives the sum of $50 per month as a bonus, making his total monthly income at this time the sum of $250 per month.

"7. During the year 1933, plaintiff and defendant entered into a written contract denominated 'Separation Agreement and Property Settlement.' At the time the parties entered into said separation agreement the plaintiff agreed and consented thereto; but the court finds that said separation agreement is unfair, unreasonable and unjust, and on account of the conduct and action of the defendant, was not freely and intelligently made and entered into by the plaintiff, and the court refuses to approve said separation agreement and property settlement. The court further refuses to approve said separation agreement for the reason that it is indefinite.

"8. Since 1927 the defendant has been guilty of gross neglect of duty and extreme cruelty toward plaintiff, and on account of the acts and conduct of defendant the plaintiff's peace of mind has been destroyed and his ability to work has been materially impaired and his income materially reduced.

### "CONCLUSIONS OF LAW

"1. The plaintiff should be granted a divorce from the defendant on the grounds of gross neglect of duty and extreme cruelty.

"2. The defendant should be given custody, care and control of the said minor children, Denoya and Marcheta, subject to the right of the plaintiff to visit said children at all proper and reasonable times.

"3. Said separation agreement and property settlement is void and is unfair, unreasonable and unjust, and should not be approved by the court.

"4. The plaintiff should pay the defendant alimony in the sum of $900, payable at the rate of $50 per month commencing on July 1, 1937, until fully

paid, and in addition thereto the plaintiff should pay the sum of $75 per month for the support, maintenance and education of said children for a period commencing July 1, 1937, and continuing until the youngest child shall attain the age of 18 years, unless the court makes other and further orders for the support, maintenance and education of said children. All payments to be made through the clerk of the district court of Saline county, Kansas. Plaintiff should pay all costs of this action and $100 attorney fees for the defendant's attorney."

Judgment was entered accordingly. Defendant's motion for a new trial was overruled, and she has appealed.

On behalf of appellant it is contended there was no corroboration of plaintiff's testimony. We think the point is not well taken. Both parties testified at length, and two additional witnesses were called who supported the testimony of plaintiff in some particulars.

On behalf of appellant it is argued there was no substantial evidence to sustain the court's finding of extreme cruelty and gross neglect of duty. This requires an examination of the evidence tending to support the findings. The parties were married January 21, 1924, at defendant's home at Tulsa, Okla., while they were students at our state university at Lawrence. Plaintiff had done newspaper work, was taking the course in journalism, and working part time as a printer. Defendant was taking a college course, and working part time. They began housekeeping in an apartment at Lawrence. Defendant continued in school and completed her course. Plaintiff quit school, lacking one semester of graduating, and took full-time work as a printer in order to make enough money to pay their joint living expenses. When school was out they moved to Osborne, where plaintiff was employed. While there defendant was treated for anemia, and perhaps it was while they lived there she had a miscarriage. In a few months, perhaps early in 1925, plaintiff procured employment at West Palm Beach, Fla., and the parties moved there. His salary there was $75 per week at first and was increased to $100 per week. The work lasted about two years. In 1926 the daughter Denoya was born. When the second child was expected in 1927, defendant was exceedingly nervous, dissatisfied with the hospital service there, with her doctor, with her home, with living in Florida, and had varying and changing ideas about what to do. She and plaintiff discussed the situation, and concluded it would be better for her to be with her mother at Tulsa when the next child was born, and plaintiff prepared to take her there. When the time came to go she was uncertain about the move, but they went, mak-

ing the trip in an automobile. Soon after they reached Tulsa the second daughter, Marcheta, was born, prematurely. Plaintiff returned to his work in Florida. Defendant remained at Tulsa several months, where she and the children had an apartment. Then she returned to Lawrence and took further work in the university that summer and fall. She had the children with her. Plaintiff's work in Florida ended, through no fault of his own, and he found work in Montana. Defendant did not go there with him because she wanted to continue in school. While he was in Montana she wired him to come. He learned, by calling her by telephone, that she was dissatisfied with arrangements for the care of the children and needed his advice. He went to Lawrence, where more satisfactory arrangements were made. He worked at Lawrence for a short time, but the pay was not satisfactory; then at Kansas City, where the pay was a little better, and early in 1928 found more satisfactory work at Junction City, where defendant and the children joined him, and they had an apartment. That summer she left the children with him and went to California for a visit, and returning, stopped at Edmond, Okla., and enrolled as a student in the State Normal School. At the end of the first quarter of the school year she went to Junction City to visit her husband and children, then went back to Edmond for her personal belongings and returned to Junction City. In the meantime the apartment was given up and plaintiff had rooms and board with a family where the children could be cared for. On her return to Junction City they again took an apartment. His work at Junction City paid $40 per week, with perhaps $5 for overtime. In the spring of 1929 he got a position with the Consolidated Printing Company at Salina, at $50 per week. He has worked for that firm continuously until the trial of this action, except for five months early in 1935. While his salary has varied somewhat, it has never been less than $50 per week, and at the time of the trial was $250 per month. He has become unusually proficient in his work, foreman of the printing department, making estimates of costs, and supervising all work in the department. His employer testified that there is no more capable man in the state for this work. In the summer of 1929 defendant went to Ohio to visit her sister for several weeks. In 1930 she went to New York to visit the same sister, who had moved there, and from there went to Missouri and spent July 4 with the children at the home of plaintiff's parents, and returned to New York the next day to con-

sult a gynecologist, returning to Salina in August. The next year she went to the west coast, and to Alaska, and was gone about two months. At each of these times she left the children with plaintiff; at one time her mother stayed with him and cared for the children; the other times plaintiff had some of his people in Missouri take care of the children. In 1932 defendant took the children and made an extended trip to Wyoming and Utah. Plaintiff paid the expenses of these trips, and of her schooling at the state university and the Oklahoma State Normal. They bought a few articles of furniture at Tulsa and Lawrence. Some of these were taken to Junction City and sold when she enrolled in the normal school at Oklahoma, for it then appeared they would not live together again. At Salina they lived in furnished apartments, changing each time she went away. They did buy a Frigidaire, but defendant spoke to a neighbor about selling that because she was gone so much in the summer. At times plaintiff begged her not to take these trips, and disrupt their home as they did, but this had no effect. There is testimony, also, that he was a good husband, always kind. There is testimony defendant was never satisfied or contented, and on account of this plaintiff's home life was never pleasant, and that she told a neighbor if plaintiff would give her the children and $50 a week she would divorce him; that she had no feeling for him whatever. Defendant testified she was never happy in her marriage to plaintiff; that they were never close; that there was no real affection between them. He testified that such affection as there was at first had been lost. They realized this situation, and discussed it several times and talked of a separation, and possibly a divorce. Each was agreeable to something of that kind.

In 1933, perhaps in the spring, though the specific date is not shown, the parties executed the "separation agreement and property settlement" which defendant in her cross petition asked the court to approve. This recited "the parties hereto have developed differences which make it impossible for them to continue to live together"; that they desired the agreement to be drawn up, and "it is mutually agreed by and between the parties hereto that the husband will pay to the wife for the support of said wife and for the support, maintenance and education of the minor children of said parties," naming them, "two thirds of husband's income until the remarriage of the wife or until the said children have been graduated from high school and college if said wife does not remarry before that time.

After said children have graduated from high school and college, the wife not having remarried, the husband agrees, from that time until her remarriage, or as long as the wife shall live, if the wife never remarries, to pay to the wife one third of his income." It was further mutually agreed that in the event of the remarriage of the wife the husband would pay her $30 per month to be used for the maintenance and education of the children until they finished high school; and in addition pay to her, in trust, an additional sum of $70 per month to create a trust fund for the college education of the children. If the payment of $30 and $70 per month exceeded one third of the husband's income, the payments were to be reduced proportionately. When the trust fund aggregated $8,000, payments into it should cease; if it did not reach that sum by the time the children were ready to enter college, the husband agreed to finance the college education of the children to an amount of $6,000, less the sum then in the trust fund. It was agreed the wife should have the exclusive control and custody of the children, with the right of the husband of seeing and visiting with them at all reasonable times. By this agreement they divided their two automobiles, the wife taking the better one, the husband the other, and he agreed to continue to pay the premiums on certain insurance policies and not to change the beneficiary named therein. It recited that the wife accepted these agreements on the part of her husband in full settlement of her rights in and to the property of the husband and in full of her rights or claims for support thereafter; that neither party should claim any right or interest in the property of the other presently owned, or hereafter acquired; that it was a full and complete settlement, each party having full knowledge of the property owned and possessed by the other, and in the event either party secured a divorce, "that party shall cause this separation agreement and property settlement to be presented to and approved by the court, and said wife shall have judgment therein for the payments herein agreed to be paid to her directly or to her for the use and benefit of said children. No other or further judgment for support, alimony, temporary or permanent, suit money, costs or attorney fees shall be applied for or obtained in any divorce action. The party bringing any divorce action shall pay the costs in said action resulting." By it the wife agreed not to incur debts or buy on the credit of the husband, the same as if the parties had never been husband and wife. The agreement was to be binding upon the parties

whether a divorce was granted or not, and they further agreed, after its execution, to live separate and apart.

Soon after this agreement was executed defendant took the children and her automobile and went to Piedmont, Cal., where she had the children in school for one year, then to Alameda for two years. During this time plaintiff sent her $150 per month (except for four months from November, 1935, to February, 1936, when he sent $50 per month). His salary during that time was $225 per month. While there defendant got employment with an association of merchants, contacting new residents, or demonstrating household equipment, which enabled her to earn from $80 to $100 per month a part of that time. She made, at the best, a bad business deal, in that she loaned some money to a man on whom she said she had to rely for information in making contacts with new residents, and took his note, of which only a small part has been repaid. It does not appear that plaintiff paid her any additional money by reason of it. Early in 1935 plaintiff got employment in San Francisco, across the bay from Alameda. In the five months he worked there the parties saw each other a few times, but did not resume marital relations. On one occasion she called him to come to her apartment. He found her in a very serious mental state; upset, worried, despondent; she spoke of the business transaction above mentioned; thought her competitors were in league against her, tapping her telephone wire, watching her home at night, and following her in the daytime. At her request he spent several evenings with her, endeavoring to quiet her. A few days later she took a trip to Mexico for three weeks. In the summer he returned to his work at Salina. In the fall of 1935 he got an almost new used automobile. She learned of this and wanted to trade the car she had for it. He agreed to this if she would pay the balance, about $200, due on the car he had—deductions to be made from his monthly remittances to her. She consented to this and the exchange was made. He made some reductions from his remittances, but she wrote that she needed all the money and he ceased making them. Several months later she sold the car for $400 and kept all the money.

In the fall of 1936 she went to Chicago, rented an apartment, put the children in school, entered Chicago University, and took a course to qualify her as a pyschiatric social worker. She spent the school year there prior to the trial, and another school year will be required for her to finish the course, when she hopes to get employment in that work at from $100 to $125 per month.

We agree with counsel for appellant that the evidence does not show extreme cruelty as that term is defined in the authorities. (*Masterman v. Masterman*, 58 Kan. 748, 51 Pac. 277; *Rowe v. Rowe*, 84 Kan. 696, 115 Pac. 553; Id., 89 Kan. 592, 132 Pac. 208; *Williams v. Williams*, 106 Kan. 751, 189 Pac. 910.) Here there is no evidence of charges of infidelity, or of harsh or brutal words or conduct, or of anything done cunningly or subtly with the intention to injure the feelings or reputation of plaintiff.

The divorce was granted upon the ground, also, of gross neglect of duty. That term is indefinite, although it means something more than simple neglect. Each case must be examined by itself. (19 C. J. 69; *Smith v. Smith*, 22 Kan. 699.) Here, while each had, and apparently still has, a high regard for the other, and neither wants to see any specific harm come to the other, there never has been that real affection between them essential to a happy home and a successful marriage. The testimony of each of them disclosed that they never got along well together; there was a constant feeling of estrangement between them; repeated and almost continuous bickering and disagreements between them over relatively trivial things when they were alone. This destroyed plaintiff's peace of mind, and decreased his efficiency to work, and affected his earning capacity. There is room to say the blame was not all on one side, but the trial court was in better position to say which party was responsible for it than is this court. In the division of responsibilities between husband and wife, the greater duty of having a harmonious home ordinarily falls upon the wife, just as the greater duty of providing a living falls upon the husband. Here the evidence sustains the view that defendant's interest in a harmonious home was secondary to her own ambitions apart from the home, and that she carried this to such an extreme as to be primarily responsible for the failure of their marriage. Both knew their marriage had failed. Each wanted a divorce. To refuse a divorce would serve no good purpose. We are unable to say there was no substantial evidence of gross misconduct of defendant sufficient to sustain the judgment for divorce.

After granting the husband a divorce, because of the fault of the wife, the court gave the wife judgment for alimony against the husband for $900. Counsel for appellant points out that the court had no authority to do that under our statute (G. S. 1935, 60-1511). The point is well taken. In *Hendricks v. Hendricks*, 136 Kan. 69, 12 P. 2d 804, where a similar decree and judgment were rendered, it was held:

"Where a divorce is granted by reason of the fault or aggression of the wife, the court does not have the power to require the husband to pay permanent alimony."

Appellee has no cross-appeal from this portion of the judgment, but appellant is concerned with its validity. The ordinary rule is, a valid judgment must be within the power of the court to render. Whether, if this judgment were affirmed, appellee could hereafter raise the question of the validity of this judgment, we need not consider, as that question is not before us. We simply decline to approve an invalid judgment when its invalidity is called to our attention.

Counsel for appellant contends the court erred in finding the separation agreement unjust and unreasonable, that it was not freely and intelligently made by plaintiff, that it is indefinite, and in holding it to be void. There is merit in this contention. As previously noted, its validity does not appear to have been put in issue by the pleadings. It would seem plaintiff violated the agreement when he filed his petition without setting it up and asking the court to approve it. If he thought it invalid for any reason he might have set it up and stated the facts or reasons for which he thought it invalid, but this was not done. There is no evidence in the record as to who prepared the agreement, or at whose instance, or under what circumstance it was prepared; hence, there is no evidence to sustain the court's finding that it was not freely and intelligently made by plaintiff. Plaintiff obviously sought to ignore this agreement, both in his pleadings and in the evidence. Plaintiff called defendant as his first witness. On cross-examination she was asked about the agreement and started to answer, when counsel for plaintiff objected that it was not proper cross-examination. This was sustained. Technically the ruling was correct; plaintiff's counsel had not asked about that on direct examination. When plaintiff was on the witness stand his counsel asked him nothing about that matter. When defendant was testifying in her own behalf her counsel sought to introduce this agreement in evidence. The following occurred:

(Counsel for plaintiff): "We object to it on the grounds that it is incompetent, irrelevant and immaterial and not effective in this case and the terms of the contract that ever was recognized and in force—that arrangement has never been agreed on, that the parties have lived together since then.

(Counsel for defendant): "I think the court should have it to consider.

(The court): "Just what bearing does that have on what is going to happen now? You made your offer and I will pass on the admittance of it later."

The record shows no further ruling on the application. As we read the record, including the transcript, it does not appear the parties lived together as husband and wife after this agreement was executed; there is positive testimony to the contrary. If that were true it would not necessarily avoid their separation agreement. (*Dennis v. Perkins,* 88 Kan. 428, 129 Pac. 165; *Ross v. Ross,* 103 Kan. 232, 173 Pac. 291.) Neither does it show the contract had never been recognized as in force, but, on the contrary, shows that since its execution to the time of the trial, about four years, the parties had lived separate and apart from each other; that defendant had the custody of the children, and that plaintiff, with the exception of four months, had sent to her each month for the support of herself and the children substantially two thirds of his salary, which appears to have been his only source of income.

In passing on the validity of the agreement, when judgment was rendered the trial court had nothing before it but the agreement itself and defendant's request in her cross petition that it be approved. We have the agreement before us and can read it and determine its meaning and validity as well as the trial court could do.

Looking at this agreement we see nothing unreasonable in its provisions respecting the custody, support and education of the children. The provisions are of the kind that an intelligent, fair-minded man, conscious of his duties and obligations with respect to his children, and desiring them to receive a good education, naturally would want to make. The court's decree gave defendant the custody of the children, substantially as the agreement had done. Plaintiff had testified that she was a good mother to the children and that she would not rob them to clothe herself. There was other testimony that she is an exceptionally capable and intelligent mother, particularly respecting their diet and health. The court correctly found, under the evidence, that she is a suitable person to have control and custody of the children. The court required plaintiff to pay $75 per month for support and education of the children. By the agreement he was to pay one third of his income, which, at the time of the trial, was about the same as the amount the court ordered to be paid, but would, of course, vary with his income. Perhaps there was no reason for the court to change the amount which the agreement provides he should pay for the support of the children. If that should prove inadequate, the court, in any proper action or proceeding, could require him to pay more, for the children are not parties to the

contract, and the father by this contract could not relieve himself wholly from his natural and legal obligation for their support. The court stopped the payments when the children should get through high school. Plaintiff had agreed to finance, or assist in financing, their college education. We see nothing unreasonable about that, nor any cause for the court to disapprove it, or relieve plaintiff of this obligation, particularly when he does not request it.

The provisions for payment to the wife are not invalid as a matter of law. The amount the husband agrees to pay his wife may be based upon a share of his income (Lindey, Separation Agreements, p. 228, and authorities cited), and the husband may lawfully agree to continue such payments as long as his wife lives, or during her natural life (Lindey, Separation Agreements, pp. 221, 222, and authorities there cited), or for a shorter time, as until her remarriage (Id., p. 243). Such agreements may remain in full force after a divorce between the parties (Id.), particularly if they specifically so provide. (19 C. J. 250.) Neither is it so indefinite as to be invalid. It provides for several contingencies and makes specific provisions for each of them. It is indefinite only because it is unknown in advance which situation will arise, but it is not indefinite as to the obligations of the parties when they do arise.

In support of the holding of the trial court, counsel for appellee makes no analysis of this agreement, and does not attempt to point out which of its provisions is void. He contents himself by contending that it imposes obligations on plaintiff with respect to payments to the wife which the court, under our statute, could not impose on plaintiff in a divorce action, if no agreement between the parties had been entered into. Cases are cited (*Noonan v. Noonan,* 127 Kan. 287, 276 Pac. 826; *Conway v. Conway,* 130 Kan. 848, 288 Pac. 566; *Hardcastle v. Hardcastle,* 131 Kan. 627, 293 Pac. 391; *Revere v. Revere,* 133 Kan. 300, 299 Pac. 595) in which it was held (where the divorce was granted to the wife because of the fault or aggression of the husband) the court could not give judgment for alimony to the wife in an indefinite sum, or for periodical payments over an indefinite time, as for life, or until the wife should remarry, but that the judgment for alimony must be in a specific sum, although it may be made payable at once or in future installments at the discretion of the court. This argument and this line of authorities are not in point. There is a distinct difference between what the court has authority under statutes to do with respect to alimony in a divorce case and what the parties may agree upon.

In *Hyde v. Hyde,* 143 Kan. 660, 56 P. 2d 437; Id., 147 Kan. 134, 75 P. 2d 1023, pending a divorce action, the parties made an agreement as to the custody of their daughter and the sum the husband would pay the wife for her care and maintenance. They executed this and had it embodied in the decree of divorce. Later the wife brought a separate suit for the specific performance of the contract. A decree was entered. Later the defendant moved to modify the sum to be paid, contending the court had the same right to modify the decree in that respect that it would have to modify a decree entered under the statute in a divorce case with respect to the amount the husband should pay for the support of a child. The court declined to follow that view. The parties were competent to contract, they had done so, the contract set out the conditions under which the amount to be paid could be modified, and in that respect the rights and liabilities of the parties were governed by the terms of the contract, not by the statutory authority of the court in divorce cases.

In granting a divorce the court has no authority under the statute to decree that a part of the property of the husband shall be the sole property of the children (*Melton v. Every,* 105 Kan. 255, 182 Pac. 543), but the parties to the action may agree that the fee to certain of their property shall vest in the children, and be bound by such an agreement. (*Cowle v. Cowle,* 114 Kan. 605, 220 Pac. 211.)

In *Ross v. Ross,* 103 Kan. 232, 173 Pac. 291, the parties had made a separation agreement by which the wife had accepted a certain sum as her full share of her husband's property. Later the parties lived together for a time, then the wife brought an action for divorce, in which the court gave her an additional sum as alimony. This was held to be error; that the contract having been fairly entered into, the wife was bound by it.

·A husband and wife are competent parties to agree between themselves upon a division of property and payments to be made by the husband for the support of the wife. When such agreements are fairly and intelligently made—that is, when they are not induced by fraud, duress, concealment, or undue influence, not the result of mutual mistake, and when the parties fully understand what they are doing—they are uniformly upheld by the courts. (13 C. J. 465, 466; *King v. Mollohan,* 61 Kan. 683, 60 Pac. 731; *Dondelinger v. Dondelinger,* 101 Kan. 179, 165 Pac. 849; *Blair v. Blair,* 106 Kan. 151, 186 Pac. 746; *Bradley v. Burgess,* 109 Kan. 347, 198 Pac. 967;

*Dutton v. Dutton,* 113 Kan. 146, 213 Pac. 326; *Arthur v. Moorhead,* 128 Kan. 421, 277 Pac. 1015; *Hewett v. Gott,* 132 Kan. 168, 294 Pac. 897.)

Courts have no authority to ignore a contract, fairly and intelligently made by the parties, and to make another for them. (*Shaffer v. Shaffer,* 135 Kan. 35, 10 P. 2d 17.)

It was error for the court to hold this agreement void.

The result is, the judgment of the trial court should be affirmed insofar as it granted plaintiff a divorce on the ground of gross neglect of duty; the judgment for defendant against plaintiff for alimony in the sum of $900 should be reversed; the findings and judgment of the court respecting the invalidity of the separation agreement should be set aside, and with respect to that instrument the court should be directed to approve it. It is so ordered.